IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FMC CORPORATION<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SHOSHONE-BANNOCK TRIBES,<br><br>　　　　Defendant. | Case No.　4:14-CV-489-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

In several pending motions, the Tribes and FMC ask the Court to determine whether the Tribes may enforce a Judgment imposed by the Tribal Appellate Court. That Judgment imposes an annual permit fee of $1.5 million. The Court heard oral argument on the motions and took them under advisement. For the reasons explained below, the Court finds that the Tribes had jurisdiction over FMC to impose the permit fees, and will grant the Tribes' motion to enforce the Tribal Court Judgment.

## SUMMARY

For over 50 years, FMC operated a phosphorus production plant on 1,450 acres of property FMC owned in fee in Pocatello, Idaho, lying mostly within the Shoshone-Bannock Fort Hall Reservation. FMC's operations produced 22 million tons of waste products stored on the Reservation in 23 ponds. This waste is radioactive, carcinogenic, and poisonous. It will persist for decades, generations even, and is so toxic that there is no safe method to move it off-site.

The waste's extreme hazards led the Environmental Protection Agency (EPA) to declare the site a CERCLA Superfund clean-up site and to charge FMC with violating the Resource Conservation and Recovery Act (RCRA). The EPA designed and implemented a program to contain the waste.

To avoid litigation over the RCRA charges, FMC negotiated with the EPA over a Consent Decree. As a condition of agreeing to that Consent Decree, the EPA insisted that FMC obtain Tribal permits for work FMC would do under the Consent Decree on the Reservation. The Tribes, however, were demanding $100 million for those permits, although they would drop the fee to $1.5 million a year if FMC consented to Tribal jurisdiction. To get the lower permit fee, and to satisfy the EPA's condition that they obtain Tribal permits, FMC consented to Tribal jurisdiction.

FMC challenged those permit fees in Tribal courts by producing evidence that the stored waste had caused no harm and the EPA's containment program foreclosed any need to impose substantial fees. The Tribes produced evidence that the waste was severely toxic, would remain so for generations, and could not be moved off-site. After hearing this evidence, the Tribal Appellate Court issued a Judgment against FMC requiring them to pay an annual fee of $1.5 million.

The parties brought this action to resolve the issue whether the Tribes could enforce that Judgment. The Court finds that the Tribes have jurisdiction over FMC. The source of the jurisdiction is based on FMC's consent, discussed above, and the catastrophic threat FMC's waste poses to Tribal governance, cultural traditions, and health and welfare.

Having identified the *source* of the Tribes' jurisdiction over FMC, the Court turns next to the *scope* of that jurisdiction. To the extent that Tribal jurisdiction is based on FMC's consensual relationship with the Tribe to pay $1.5 million annually to store hazardous waste within the Reservation, the Tribes have jurisdiction to impose the $1.5 million annual fee for as long as the waste is stored there. The Tribal Appellate Court relied on this ground of jurisdiction to impose its Judgment, and the Court finds that the Judgment must be enforced on that ground.

To the extent that Tribal jurisdiction is based on the catastrophic threat FMC's waste poses to the Tribes, the amount of the annual permit fee must be closely tied to the threat. Here, the Tribal Appellate Court never identified the measures necessary to protect against the threat and their cost. Instead of using that calculation to arrive at the $1.5 million figure, the Tribal Appellate Court simply carried over that amount from the consensual relationship agreement between FMC and the Tribes. Using an agreed-upon figure is fine when the basis of jurisdiction is a consensual relationship, but when jurisdiction is based instead on a catastrophic threat, the amount of the Judgment must bear some relationship to the Tribes' need to protect against the threat. Because there is no such relationship in this record, the Court cannot enforce the Judgment on the basis of the catastrophic threat basis for Tribal jurisdiction. Nevertheless, the Court will enforce the Judgment because, as discussed above, it was properly entered under the consensual relationship basis for Tribal jurisdiction.

# FACTUAL BACKGROUND

## History of the FMC Plant Cleanup

From 1949 to 2001, FMC and its predecessors operated an elemental phosphorus production plant on 1,450 acres of property FMC owned in fee in Pocatello, Idaho, lying mostly within the exterior boundaries of the Shoshone-Bannock Fort Hall Reservation. FMC historically stored the waste from its plant in ponds on that property. FMC has estimated that about 22 million tons of waste is contained in the 23 waste storage ponds on FMC's property. The waste includes hazardous materials such as arsenic, and radioactive materials that emit gamma radiation which exceeds the human health safety standards set by the Environmental Protection Agency (EPA). In 1990, the EPA declared the FMC plant a superfund clean-up site under CERCLA, and in 1997 charged FMC with violating RCRA, a law regulating the disposal of hazardous and non-hazardous solid wastes.

To resolve these RCRA charges outside of litigation, FMC began negotiation over the terms of a Consent Decree with the EPA. As a condition of any agreement, the EPA required that FMC obtain necessary permits for the clean-up work from the Tribes. The proposed Consent Decree would require construction of new waste storage ponds and a treatment facility on FMC's property within the Reservation boundaries, and so the Tribes were demanding that FMC obtain Tribal permits for this work. Because the EPA was insistent on FMC obtaining the necessary Tribal permits, FMC "was justifiably concerned that an unresolved dispute between FMC and the Tribes would jeopardize the likelihood of successfully completing FMC's Consent Decree negotiations with the

United States." *See FMC Response Brief (Dkt. No. 72)* at p. 18. According to FMC, resolution of the waste permit issue with the Tribes was "of such great importance that FMC's negotiating team was led Paul McGrath, FMC's Senior Vice President and General Counsel." *Id.*

McGrath faced a substantial obstacle – the Tribes were demanding $100 million to issue the permits. *See* 002610. Finding himself in a weak bargaining position, FMC's negotiator McGrath, "select[ed] the only rational choice for resolving FMC's dispute with the Tribes – to negotiate a lower fee." *See FMC Response Brief, (Dkt. No. 72)* at p. 18.

The Tribes were willing to negotiate a lower fee but only if FMC consented to Tribal jurisdiction. FMC described its analysis of the Tribes' demand: "FMC knew that contesting the Tribes' jurisdiction would take years. Although FMC vigorously disagreed with the Tribes' assertion of jurisdiction to compel compliance with the claimed permit requirement, FMC had no realistic alternative but to resolve its dispute with the Tribes in a manner that would enable continued operation of the Pocatello Plant . . . . Permanent shutdown of the Pocatello Plant at that time would have caused FMC severe economic damages." *See FMC's Statement of Facts (Dkt. No. 67-1)* at p. 9.

On August 11, 1997, FMC's Health Safety & Environmental Manager David Buttelman filed applications for permits with the Tribes and stated in an accompanying letter as follows:

> Through submittal of the Tribal "Building Permit Application" and the Tribal "Use Permit Application" for Ponds 17, 18 and 19, FMC Corporation is consenting to the jurisdiction of the Shoshone-Bannock

        Tribes with regard to the zoning and permitting requirements as specified
        in the current Fort Hall Land Use Operative Policy Guidelines.

*See Exhibit 57.*  With FMC having consented to Tribal jurisdiction, the Tribes lowered

their fee to $1.5 million a year to cover hazardous and nonhazardous waste beginning in

1998 and continuing "for every year thereafter . . . ."  *See Exhibit 61.*

        FMC responded to that letter on May 26, 1998, by expressing its appreciation for

the Tribes "agreeing to the fixed fee proposal that we discussed, which we understand

will apply during the time these ponds are in operation," and by stating "we . . . intend to

make the payments of $2.5 million on June 1, 1998, and the $1.5 million on June 1 in the

following years."  *See Exhibit 62.*  The Tribes' attorney Jeanette Wolfley objected to the

language in this letter implying that the obligation to pay the fee would end with the

closure of Ponds 17, 18 & 19.  According to FMC's Division Manager, Robert Fields,

Wolfly asked McGrath "to acknowledge in writing that the Use Permit and the annual fee

applied broadly to the entire facility."  *See Exhibit 66, Fields Affidavit.*

        Fields testified that "McGrath agreed and sent Ms. Wolfley his letter of June 2,

1998."  *Id.*  In that letter, FMC clarified that the language of the May 26 letter was "too

narrow, and indeed it is our understanding . . . that the $1.5 million annual fee would

continue to be paid for the future even if the use of ponds 17-19 was terminated in the

next several years."  *See Exhibit 63.*

        FMC's resolution with the Tribes was a major factor in reaching an agreement

with the EPA on the RCRA Consent Decree.  Within just a few months of resolving the

permit issues, FMC reached agreement with the EPA on the RCRA Consent Decree.  By

the terms of that Consent Decree, FMC agreed to pay a fine of $11.9 million and to close

and cap the waste ponds in accordance with closure plans developed in coordination with

the EPA – removal or treatment of the waste was deemed too expensive and too

dangerous by the EPA. *See Interim Record of Decision Amendment (IRODA)* at pp. 1-2.

To do the work necessary to comply with the Consent Decree, FMC was required to

obtain Tribal permits, as set forth in paragraph 8 of the Consent Decree: "Where any

portion of the Work requires a . . . tribal permit or approval, [FMC] shall submit timely

and complete applications and take all other actions necessary to obtain all such permits

or approvals."

## Prior Proceedings in the Federal Courts

The EPA did file an action against FMC but simultaneously presented the Consent

Decree to this Court for approval to settle the lawsuit. The Tribes objected to the

Consent Decree, seeking removal of the waste rather than capping of the ponds. The

Court granted the Tribes motion to intervene, but found that "the capping requirements

are adequately environmentally protective – the record contains no legitimate basis on

which the Court could conclude that capping allows an unreasonable health risk to go

unchecked," and approved the Consent Decree. *See Order (Dkt. No. 27) in U.S. v. FMC,*

*CV-98-406-BLW.*

On appeal, the Ninth Circuit affirmed that decision, holding that "the Tribes have

presented no evidence that capping the ponds poses a threat to human health and the

environment." *See U.S. v. Shoshone-Bannock Tribes*, 229 F.3d 1161 at *2 (unpublished

disposition) (9th Cir. 2000). In the proceedings before the Ninth Circuit, FMC argued

that the Tribes had no right to object to the Consent Decree because the Tribes had "granted permits to FMC for its construction and use of Ponds 17 and 18 . . . subject to payment of a $1 million startup fee and a $1.5 million annual permit fee payable to the Hazardous Waste Program of the Tribes Land Use Department." *See Brief of FMC, 2000 WL 33996531, at *17-18*. While not specially citing this argument, the Circuit did hold that the Tribes had been adequately consulted. *Shoshone-Bannock Tribes,* 229 F.3d at *2.

Between 1999 and 2005, FMC completed closure and capping of the RCRA Ponds pursuant to this Consent Decree and the EPA-approved closure plans. In 2005, FMC certified final closure of the last of the RCRA Ponds in accordance with EPA-approved closure plans. *See* 002371.

FMC paid the annual permit fee of $1.5 million under the 1998 agreement from 1998 to 2001. In December of 2001, FMC ceased all mineral processing operations at the site. When the fee became due for 2002, FMC objected, arguing its obligation had ended because (1) the Tribes failed to codify the fee to "ensure that [it] remains the same in the future"; and (2) the fee only applied to the disposal of waste, not its storage, and FMC had ceased disposing of waste. FMC refused to pay the $1.5 million fee and refused to apply for any further permits as it continued with the RCRA clean-up efforts.

After negotiations failed, the Tribes filed a motion in *U.S. v. FMC, CV-98-406-BLW* asking the Court to clarify whether FMC had an obligation to obtain tribal permits for activities FMC undertook under the RCRA Consent Decree. This Court issued a decision on March 6, 2006, holding that (1) the Tribes had jurisdiction over FMC under

the first *Montana* exception (*see Montana v. U.S.*, 450 U.S. 544, 565-66 (1981)), (2) FMC was required to apply for Tribal permits based on FMC's agreement to submit to tribal jurisdiction in ¶8 of the RCRA Consent Decree, (3) the Tribes were intended third-party beneficiaries of the Consent Decree and therefore had a right to enforce its terms; and (4) FMC was required to exhaust tribal remedies over any challenges to the Tribal permit decisions. *See U.S. v. FMC,* 2006 WL 544505 (D.Idaho 2006).

On appeal, the Ninth Circuit only addressed the third finding and reversed it, holding that the Tribes were merely incidental beneficiaries of the Consent Decree without standing to enforce its provisions. *U.S. v. FMC,* 531 F.3d 813 (9th Cir. 2008). The Circuit vacated this Court's decision and remanded the case with instructions to dismiss the action. *Id.* at 824. At the conclusion of its decision, the Circuit noted that FMC had "began the process of applying for tribal permits, which is the main relief that the Tribes have sought in this action" and that FMC's counsel during oral argument "represented to the court that FMC understands that it has the obligation to continue, and will continue, with the current tribal proceedings to their conclusion." *Id.* at 824.

**Initial Proceedings Before the Tribal Courts**

FMC's application was granted by the Tribes' Land Use Policy Commission (LUPC) on the condition that FMC either resume paying the $1.5 million fee or pay a much higher fee based on the weight of the material stored in the ponds. FMC appealed that decision to the Fort Hall Business Council (FHBC), which affirmed the LUPC decision. FMC appealed the FHBC decision to the Shoshone-Bannock Tribal Court.

The Tribal Court issued two decisions. The first, issued on November 13, 2007, held that FMC was subject to Tribal jurisdiction, and the decision also dismissed the Tribes' breach of contract and air quality permit counterclaims. The second, issued on May 21, 2008, held that (1) FMC was required to obtain a Tribal Building Permit, but the Tribes could not impose a $3000 fee for that permit; (2) FMC was not required to obtain a special use permit; (3) the 1998 Agreement between the parties had not been incorporated into a tribal ordinance; and (4) the Tribes could not impose the $1.5 million permit fee because it had not been approved by the Secretary of the Interior under the Tribal Constitution.

The Tribes appealed that decision to the Tribal Appellate Court, and FMC cross-appealed. The three-judge panel for the Tribal Appellate Court consisted of Judges Gabourie, Pearson, and Silak. About three months before reaching any decision, but while the case was pending before them, Judge Gabourie and Pearson spoke at a conference on tribal courts held at the University of Idaho College of Law. The conference, held on March 23, 2012, was attended by attorneys and members of the public, and was videotaped.

In their remarks, both Judges asserted that it was important for Tribes to obtain as much jurisdiction and sovereignty as possible, and explained how tribal appellate judges could issue decisions to achieve this goal for tribes. They criticized many of the principal United States Supreme Court decisions regarding tribal jurisdiction, labeling the *Montana* decision as "murderous to Indian tribes." *See* 006580. They were similarly critical of other Supreme Court decisions. Judge Gabourie told the audience that the tribal

"appellate courts have got to step in" and "be sure to protect the tribe." 006599. They explained that the way to avoid "bad decisions" was for the tribal appellate courts to ensure that the record would support any decision on appeal through the federal courts. *Id.*

Judge Gabourie also made comments about the pollution left behind by companies who operated within reservation boundaries:

> You know, there's one area, too, there are tribes that have had mining and other operations going on, on the reservation, you know, and then the mining company or whatever, manufacturing company, disappears. They leave, you know. They've – they've either dug everything they could, and the then ground is disturbed, sometimes polluted beyond repair. And you sit as a – as an appellate court justice, and you're starting to read the cases that come down from the tribal court. And you're saying to yourself, you know, We know that the – there's pollution, that the food that they're eating is polluted, the water's polluted, but nobody proved it. And while John Jones said that it is polluted, you know, John Jones don't count. But the tribal courts have got to realize that you need expert witnesses. You need chemists and whatever to get out of testifying. It may cost a little, but so the appellate court is in a position of remanding that case back and say "do it."

*See* 006598.

Judge Pearson made similar comments:

> If you're a law student and you're going to practice law, as well as if you're a judge and you're going to be hearing cases, you know where – companies come on the reservations and do business for X number of years and they dirty up your groundwater and your other things, and they they go out of business. And they leave you just sitting. And you need to know what you can do as you're sitting as a judge with those cases coming toward you.

*See* 006605-06.

About three months later, on June 26, 2012, Judges Gabourie, Pearson, and Silak issued an opinion holding that (1) the Tribes have jurisdiction under the first *Montana* exception to require FMC to obtain a waste storage permit and pay the annual fee; (2) Tribal ordinances (the Land Use Policy Ordinance and the Hazardous Waste Management Act (HWMA)) independently authorized the imposition of the waste storage permit fee on FMC; (3) the Tribal Court erred in dismissing the Tribes' air quality and breach of contract counterclaims without permitting discovery, and in failing to consider whether the Tribes have jurisdiction over FMC under the second *Montana* exception.

In April of 2013, Judges Gabourie and Pearson were replaced on the panel with Judges McDermott and Herzog. Judge Silak – a former Justice of the Idaho Supreme Court – remained on the panel. Shortly thereafter, on May 6, 2013, FMC filed a brief with the Tribal Appellate Court, asking it to reconsider the rulings of the prior panel, and arguing that if the new panel agreed with those rulings, it should then conclude the proceedings; but that if the new panel did not agree with those rulings, it should vacate the rulings of the prior panel and proceed anew. FMC supported this request by asserting that it "ha[d] obtained new evidence regarding public statements made by two of the judges [Judges Gabourie and Pearson] from the prior appellate panel" at the conference held on March 23, 2012, which FMC claimed showed that those judges were biased.

On May 28, 2013, the new panel reconsidered and reaffirmed the prior panel's determinations. The new panel also decided to hold an evidentiary hearing to resolve

whether the second *Montana* exception applied, and granted the parties a period of discovery on that issue.

**Tribal Appellate Court Evidentiary Hearing**

An evidentiary hearing was held from April 1 through April 15, 2014, with the Tribes and FMC presenting witness testimony, documentary evidence, and legal arguments regarding the second *Montana* exception. To summarize, the Tribes' evidence showed the serious toxicity of the stored waste and the uncertainty over its geographic scope, while FMC's evidence highlighted the EPA's containment program, and showed that the agency's extensive testing and monitoring revealed no actual physical harm to humans and no measurable contamination of air or water to this point.

For example, the Tribes' evidence identified components of FMC's stored waste, including the following: (1) elemental phosphorus that leaked into the subsurface soil during production; (2) elemental phosphorus and chemical byproducts from the phosphorus production process suspended in contaminated water that are contained in ponds on the site; (3) phosphine gas produced by elemental phosphorus; (4) contaminated rail cars buried at the site that were used in the transport of elemental phosphorus; (5) contaminated groundwater containing arsenic and phosphorus that seeped into the groundwater from other sources of contamination on the site; and (6) millions of tons of slag that contains radioactive materials which emit gamma radiation in excess of EPA's human health safety standards.

Testimony showed that the elemental phosphorus contained in the soil and containment ponds is reactive, meaning that it will burst into flames when exposed to

oxygen. This reaction also produces numerous chemical byproducts, which react to form phosphoric acid aerosols. The phosphorus itself is toxic when ingested, inhaled or absorbed, and will remain reactive for thousands of years. When exposed to water, elemental phosphorus produces phosphine gas, which is harmful and even deadly to humans at certain levels; indeed, it is the active ingredient in some poisons.

The Idaho Department of Health and Welfare evaluated an EPA air sample and notified the EPA that phosphine gas being released from a pond on FMC' s property was an urgent public health hazard to the health of people breathing the air in the proximity of Pond 15S, and that breathing the air for just a few seconds could cause measurable harm and could be lethal. The EPA responded to that notice and remedied the situation.

The EPA estimates that there are as much as 16,000 tons of elemental phosphorus in the ground, contaminating approximately 780,000 cubic yards of soil weighing approximately 1 million tons. But the EPA described as "significant unknowns" the "horizontal and vertical gradients in the concentrations of elemental phosphorous, the total mass of elemental phosphorous, and the form of elemental phosphorous in the soil." *See* 008543.

The Tribes' evidence showed that in 1964, FMC buried approximately twenty-one tanker rail cars on the FMC site. The tankers contained elemental phosphorus sludge, and instead of requiring workers to undertake the dangerous work of cleaning up this toxic material, FMC simply buried the rail cars, covering them with clay and then with radioactive slag. The evidence indicates the tankers contained from 200 to 2,000 tons of elemental phosphorus sludge, 10-25% of which remained in each of the tankers at the

time they were buried. The level of corrosion of the tankers is unknown and it is possible that they either have or will corrode to the point of leakage from phosphoric acid produced by the phosphorus. EPA decided that the area where the tankers were buried should be capped and that no efforts to remove the tankers should be undertaken, but it is undisputed that no remedial action to address this threat has been implemented.

Arsenic and phosphorus from the site are continuously flowing in the groundwater from FMC's land through seeps and springs directly into the Portneuf River and Fort Hall Bottoms. This negatively affects the ecosystem and subsistence fishing, hunting and gathering by tribal members at the River, as well as the Tribes' ability to use this important resource as it has been historically used for cultural practices, including the Sundance. The EPA's Interim Amendment to the Record of Decision for the EMF Superfund Site FMC Operable Unit Pocatello Idaho (2012) ("IRODA") calls for a decades-long regime of ground water monitoring and treatment to minimize risks. However, such intervention programs are in the design phase only, and have not yet been implemented. Uncontroverted evidence at trial showed that Tribal members' ability to take part in tribal cultural practices on the River has been compromised by FMC's contributions to contamination of the River. Although FMC tried to show that none of the groundwater seeping into the Portneuf is above EPA levels of concern, Rob Hartman's testimony did show that groundwater extraction systems have not been put into place at the FMC site, and that arsenic and phosphorus are actually traveling to the Portneuf River.

Although the EPA has been involved at this site since 1990, remedial actions chosen by the EPA have not been implemented. Many of EPA's proposed remedial actions are still in design phase only, and the threat at the site remains today. EPA's IRODA is itself only an interim measure, and according to the IRODA, a final Record of Decision will not be available for five to ten years. In any event, EPA's plans are containment plans, which would keep the threatening hazardous wastes on fee land for the indefinite future.

FMC, on the other hand, presented evidence that EPA's containment program includes: (a) installation of engineered evapotranspiration ("ET") soil barrier caps over areas on site that are potential sources of groundwater contamination; (b) installation of engineered "gamma" soil barrier caps at areas on site containing slag fill and ore; (c) installation of a groundwater extraction and treatment system that will capture and contain all contaminated groundwater at the FMC Property fence line, and treat the extracted groundwater; and (d) long-term monitoring and maintenance of the soil caps and groundwater extraction and treatment system.

In addition, FMC produced evidence that between 1977 and 2000, independent epidemiologists from the University of Minnesota conducted multiple epidemiological human health studies of FMC's Pocatello Plant workers. Those studies establish that long-term exposure to the contaminants at the FMC Property did not cause any adverse health impacts to those workers whose exposures would be many times that of community members outside the Plant boundaries. *See* 262733; 262766; 262897. Similarly, in 2006, researchers from the Oregon Health & Science University and the

Northwest Portland Area Indian Health Board conducted an independent human health study of the Tribal community. *See* 289037. The Tribes participated in the design and implementation of that study. *See* 289038. That study failed to find adverse health impacts to Tribal members that could be attributed to contamination at the FMC Property. *See* 289053.

FMC presented evidence from the EPA that contamination at the FMC site has not affected water quality off-site. The EPA concluded that: (a) no off-site drinking water wells are contaminated from any substances emanating from the FMC Property (008022); (b) sampling conducted in 2012 and 2013 establishes that the off-site groundwater meets federal drinking water quality criteria (008027); (c) the Simplot plant is the source of 95% of total arsenic and more than 95% of the total phosphorus mass loading to EMF Superfund Site-impacted groundwater flowing into the Portneuf River (id.); (d) since 2001, Simplot is the sole source of fluoride emissions (007984); (e) measurements of the radioactivity establish that radium-226 levels are not a risk to human health or the environment (008069); and (f) Tribal members have not been exposed to phosphine gas, as shown by approximately 40,000 measurements of phosphine gas emissions taken since 2008 that show no detections of phosphine (0.00 parts per million) at the FMC property fence line (008151).

The Agency for Toxic Substances and Disease Registry ("ATSDR") evaluated air quality impacts from the site in 2006 after the shutdown of the FMC Pocatello Plant. *See* 285232. The ATSDR found that the Superfund Site currently presents no public health hazard. *See* 285240.

To summarize, neither side directly contradicted the other. The Tribes' evidence established without rebuttal that the waste is radioactive, carcinogenic, poisonous, and likely to remain toxic – and on the site – for decades. FMC's evidence established without rebuttal that despite the toxicity of the waste, no measurable harm had yet occurred to humans or water quality, and the EPA's containment program would prevent any future harm.

Analyzing this evidence, the Tribal Appellate Court ultimately concluded that FMC's storage of millions of tons of toxic waste posed a serious threat, and has a direct effect on, "the political integrity, the economic security, or the health or welfare of the [Tribes]." *See* 008552. Consequently, the Court held that *Montana's* second exception applied, and that the Tribes had jurisdiction to require FMC to obtain permits for the remediation work.

Based on this ruling, the Appellate Court issued a Final Judgment against FMC, dated May 16, 2014, finding FMC liable for a permit fee of $1.5 million a year. The Judgment charges FMC with $19,500,000 in permit fees for the years 2002 up through the date of the Judgment in 2014, $928,220.50 in attorneys' fees, and $91,097.91 in costs, for a total of $20,519,318.41. Both sides agree that the Judgment imposes the $1.5 million fee in perpetuity with no ending date established.

FMC responded to this Judgment by filing this lawsuit in November 2014, requesting that this Court deny enforcement of the Judgment issued by the Tribal Appellate Court. The Tribes counterclaimed for an Order allowing them to enforce the Judgment.

## LEGAL STANDARDS

The recognition and enforcement of tribal judgments in federal court rests upon principles of comity, which is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Wilson v. Marchington*, 127 F.3d 805, 809 (9th Cir. 1997) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895)). As a general policy, "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id.* At its core, comity involves a balancing of interests. "[I]t is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Id.* at 810. *Wilson* holds that "comity still affords the best general analytical framework for recognizing tribal judgments."

As a "general principle, federal courts should recognize and enforce tribal judgments." *Id.* However, federal courts must neither recognize nor enforce tribal judgments if: (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law. *Id.* In addition, a federal court may, in its discretion, decline to recognize and enforce a tribal judgment on equitable grounds, including the following circumstances: (1) the judgment was obtained by fraud; (2) the judgment conflicts with another final judgment that is entitled to recognition; (3) the judgment is inconsistent with the parties' contractual choice of forum; or (4) recognition of the judgment, or the cause of action upon which it is based,

is against the public policy of the United States or the forum state in which recognition of the judgment is sought. *Id.* "Unless the district court finds the tribal court lacked jurisdiction or withholds comity for some other valid reason, it must enforce the tribal court judgment without reconsidering issues decided by the tribal court." *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 903-04 (9th Cir. 2002).

FMC has challenged the Tribal Judgment on jurisdictional and due process grounds. The Court reviews the Tribal Courts' legal rulings *de novo. See FMC v. Shoshone-Bannock Tribes,* 905 F.2d 1311 (9th Cir. 1990) (holding that in reviewing Tribal court judgments, "[f]ederal legal questions should therefore be reviewed *de novo*). The Tribes have the burden of proving jurisdiction, while FMC has the burden of proving a lack of due process. *See generally Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1408 (9th Cir.1995).[1]

The Court will turn first to the jurisdictional challenge.

## ANALYSIS

### First *Montana* Exception

The pending motions raise the issue whether the Tribes had jurisdiction to impose a $1.5 million fine on FMC for actions taken on land owned in fee by FMC within Reservation boundaries. In *Montana v. U.S,* 450 U.S. 544 (1981), the Supreme Court

---

[1] *Pahlavi* discusses but does not resolve the burden of proof on due process issues. But the discussion in that case clearly leans toward finding that the party claiming a lack of due process has the burden of proving that defense. *Id.* at 1409 (quoting with approval a leading federal court treatise so finding, and commenting that "a strong argument can be made that a claimed lack of due process should be treated as a defense").

held that with two exceptions, the "inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" on privately-owned fee lands within a reservation. *Id*. at 565. The Tribes have the burden of proving that one of the two exceptions apply here. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008).

The first exception provides that "a tribe may regulate through taxation, licensing, or other means, the activities of non-members who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id*. at 565-66. In a decision issued 16 years after *Montana,* the Supreme Court described the scope of the first exception by explaining that what the Court "had in mind" was contained in a list of cases cited in *Montana,* including *Morris v. Hitchcock*, 194 U.S. 384 (1904), a case upholding a tribal permit tax on nonmember-owned livestock within boundaries of a reservation. *Strate v. A-1 Contractors,* 520 U.S. 438, 457 (1997).

In the *Morris* case, the Chickasaw Nation required that any non-member grazing cattle on Reservation land must obtain a permit and pay a permit tax of 25 cents per head. Cattle owners who had contracts with individual Chickasaw Nation members to graze cattle on their land failed to pay the permit tax and were threatened with seizure of their cattle. The cattle owners responded by filing suit, claiming the Chickasaw Nation had no jurisdiction to impose the tax on non-Tribal members. The Supreme Court in *Morris* upheld the right of the Chickasaw Nation to impose the tax. More than ninety years later, the Supreme Court in *Strate* confirmed the correctness of that ruling by pointing to the

consensual relationship between the cattle owners and individual members of the Chickasaw Nation as satisfying the consensual relationship prong of *Montana.*

The same type of consensual relationship exists here. In the series of letters discussed above, FMC agreed to obtain a Tribal permit to do the work necessary to comply with the Consent Decree. FMC then affirmed its consensual relationship with the Tribes by signing the Consent Decree, which required FMC to obtain Tribal permits. FMC then cited its consensual relationship with the Tribes to this Court and the Ninth Circuit as part of its argument that the Decree should be approved.

FMC complains that this agreement was a product of duress, but the Tribes only took advantage of their bargaining leverage, a long-standing practice in the sharp-elbowed corporate world in which FMC does business every day. FMC had a strong desire to obtain a Consent Decree from the EPA, but the EPA was insisting that FMC obtain Tribal permits. The Tribes, recognizing their superior bargaining position, used that leverage to extract a high price for the permits. FMC paid the price because the Tribal permit was a key component to obtaining the Consent Decree, which in turn was worth the price of the Tribal permit. This was a simple business deal, not the product of illegal duress or coercion. FMC cites no case law holding that *Montana's* exception does not apply when the consensual relationship is formed begrudgingly or by one party taking advantage of bargaining leverage.

FMC argues at length that it never agreed to submit to Tribal jurisdiction. This argument is a red herring. As *Montana, Strate* and *Morris* make clear, it is the consensual relationship that triggers Tribal jurisdiction, regardless of whether a separate

agreement to submit to jurisdiction exists. Even if a party like FMC could preserve an objection to jurisdiction at the same time it entered into a consensual relationship – a theory without legal support in FMC's briefing – FMC never made that objection before entering into the consensual relationship. Finally, even if the red herring argument is pursued, the exchange of letters discussed above shows that FMC agreed to submit to Tribal Court jurisdiction to obtain the permit they so badly wanted and needed.

For all of these reasons, the Court finds that the Tribal Courts had jurisdiction under *Montana's* first exception to resolve disputes over the Tribal permit FMC agreed to obtain authorizing it to dispose and store hazardous waste within Reservation boundaries.

## Second *Montana* Exception

Tribal jurisdiction exists under the second *Montana* exception when "the conduct of non-Indians on fee lands within its reservation . . . threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 566. For a tribe to have authority over nonmember conduct, "[t]he conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Plains Commerce Bank v. Long Family Land & Cattle Co., Inc.*, 554 U.S. 316, 341 (2008). Thus, "*Montana's* second exception does not entitle the tribe to complain or obtain relief against every use of fee land that has some adverse effect on the tribe." *Evans v. Shoshone-Bannock Land Use Policy Comm'n,* 736 F.3d 1298, 1306 (9th Cir. 2013). Rather, the challenged conduct must be so severe as to "fairly be called catastrophic for tribal self-government." *Plains Commerce*, 554 U.S. at 341 (internal

quotation and citation omitted). The fine imposed by the Tribal Judgment must be "necessary to avert catastrophe." *Evans, supra* at 1306 n.8. (9th Cir. 2013).

Here, the EPA has taken substantial steps to contain the toxic waste and prevent harm. But the threat remains: The EPA itself found in 2013 that the toxic waste "may constitute an imminent and substantial endangerment to public health or welfare or the environment." *See 2013 Unilateral Administrative Order for Remedial Design and Remedial Action No. CERLCA-10-2013-0116 (June 10, 2013).* Because the EPA intends to leave the waste on the site indefinitely, and because the waste's toxicity has such a long life – decades, if not longer – there is a real risk that no matter how well its containment system is designed, the system may fail.

That risk becomes much less abstract when the containment system's ability to contain three lethal gases – phosphine, hydrogen cyanide, and hydrogen sulfide – is examined. According to the EPA, each of these gases is "immediately dangerous to life and health" at different concentrations. *See EPA Unilateral Administrative Order for Removal Action* at ¶¶ 20-23. In 1999, the EPA ordered FMC to close and cap pond 16S, located entirely within Reservation boundaries, and in 2005 FMC certified that it had capped and closed the pond in accordance with the EPA-approved closure plan. *Id.* at ¶ 12 at 332332. But a year later, in 2006, monitoring revealed that dangerous levels of phosphine gas, hydrogen cyanide gas, and hydrogen sulfide gas were "being generated within the cap at pond 16S." *Id.* at ¶ 19. In addition, air samples showed that hydrogen sulfide gas had escaped from the pond and was being carried downwind. *Id.* In a later report, the EPA found that in 2005, 2006, 2007, and 2009, levels of phosphine gas in the

surrounding air were high enough to require workers in the area to either delay work or leave the area for their safety. *See EPA Unilateral Administrative Order for Removal Action* at ¶¶ 17-23 at 5707-09.

It is true that these releases were discovered and stopped, and that there is no evidence that anyone was harmed. At the same time, however, these EPA reports demonstrate that the waste sites are not reservoirs of passive liquid that can be contained with a simple dam. Instead, these sites are generating lethal gases that accumulate under pressure beneath the pond covers. In other words, they pose a constant and deadly threat to the Tribes, a real risk of catastrophic consequences should containment fail. And despite the best efforts of the EPA, there have been releases of these lethal gases. Indeed the EPA itself has concluded in 2010 that "[c]oncentrations of phosphine, hydrogen cyanide and hydrogen sulfide gas accumulating within the Pond 16S cap *and being released* may present an imminent and substantial endangerment to human health and the environment." *Id.* at 19 (emphasis added). In even broader terms, the EPA concluded in 2013 that the waste sites "may constitute an imminent and substantial endangerment to public health or welfare or the environment." *See EPA Unilateral Administrative Order for Remedial Design and Remedial Action (June 10, 2013).*

The Tribal Appellate Court heard testimony from a former EPA official who worked at the agency for 36 years, David Reisman, who concluded that these lethal gases were escaping from the waste sites and that the EPA's monitoring procedures were not sufficient to detect all the releases. *See Trial Transcript, Vol II at 331-33.* It is no wonder that the Tribal Appellate Court concluded that "[n]o evidence has been offered to

rebut the conclusion that if any of the containment efforts fail for any reason, escape of the toxic waste or any of its by-products at certain levels could prove catastrophic to the tribe, its members, its environment, its health, safety and welfare." *See* 8547.

This dangerous threat can only be contained, not removed or treated. The EPA has concluded there is "no technologies that could reliably, safely, and effectively be utilized to excavate and treat the elemental phosphorus-contaminated wastes" at the site. *See 2012 Interim Record of Decision Amendment* at p. 78. Removal would involve excavating 780,000 yards of contaminated soil, much of it "at a significant depth (up to 85 feet bgs [below ground surface]) and unevenly distributed throughout the soil column." *Id.* The EPA concluded that safe treatment and removal was not technologically feasible, but even if it was, it would cost $4.7 billion, an amount one hundred times greater than the cost of containment ($47 million). *Id.* at pp. 65, 83-84.

And so there it sits. For how long? The EPA calculated its cost – the $47 million figure – by estimating that containment must continue for at least 30 years. *Id.* at p. 65 (also estimating that treating all the waste would take up to 44 years).

In *Evans,* the Circuit held that Tribes failed to show that a catastrophic risk was posed by the construction of a single-family house that might cause groundwater contamination, and that the Tribes therefore lacked jurisdiction over the home builder under the second *Montana* exception. *Evans,* 736 F.3d at 1306. By comparison, the threat in this case is many levels of magnitude greater than the threat in *Evans.* FMC's waste is radioactive, carcinogenic, poisonous, and massive in size. It is so toxic that there is no safe way to remove it, ensuring that it will remain on the Reservation for decades.

While the EPA's containment program is extensive, it has not prevented lethal phosphine gas from escaping. Moreover, the EPA cannot say how deep and widespread the deadly plume of phosphorus extends underground, beyond estimating that it already extends 85 feet below the surface.

Under the standard discussed in *Evans,* the record shows conclusively that a failure by the EPA to contain the massive amount of highly toxic FMC waste would be catastrophic for the health and welfare of the Tribes. This is the type of threat that falls within *Montana's* second exception.

## Due Process

Having found that the Tribal Appellate Court had jurisdiction to resolve disputes over FMC's hazardous waste permits, the Court turns next to FMC's argument that it was denied due process in the Tribal Courts. The governing legal standard was set forth in *Marchington,* 127 F.3d at 811:

> Due process, as that term is employed in comity, . . . [requires] that there has been opportunity for a full and fair trial before an impartial tribunal that conducts the trial upon regular proceedings after proper service or voluntary appearance of the defendant, and that there is no showing of prejudice in the tribal court or in the system of governing laws.

FMC argues that the Tribal Appellate Court was not impartial, citing the statements made by Judges Gabourie and Pearson, discussed above, showing that they were biased in favor of the Tribes. But FMC asked the Tribal Appellate Court to reconsider the ruling by those Judges, and that was done by a new panel that did not include either Judge Gabourie or Judge Pearson. So even if the prior panel was biased, a new panel was

convened that independently came to the same conclusion, removing any due process concern.

That new panel was comprised of a former Justice on the Idaho Supreme Court (Judge Cathy Silak), a retired Idaho District Court Judge (Judge Peter McDermott), and a practicing attorney (Vern Herzog Jr.). After that decision was rendered, John Traylor replaced Cathy Silak on the panel that resolved the issue of the second *Montana* exception following an evidentiary hearing. Judge Traylor is a licensed attorney, was a former Trial Court Administrator for both the Tribal Courts and the Ada County State Courts in Idaho, and served as Director of Planning and Zoning for Ada County. He currently does private consulting work.

Each of these Judges has had a long and distinguished career in Idaho. There is no evidence whatsoever that they were biased in favor of the Tribes or against FMC. There is also no evidence that these Judges were stooges for the Tribal Council. The Judges all have careers that are independent of any reliance on the Tribal Council, and there is nothing in the record suggesting that the Council had any influence over them.

After examining the entire record, the Court finds that FMC received a full and fair trial before an impartial Tribal Appellate Court, and can find no prejudice there or in the Tribal laws.

## Comity Analysis

From the discussion above, the Tribes had jurisdiction under both the first and second *Montana* exceptions to resolve disputes over the permits issued to FMC allowing it to store toxic wastes within the Reservation boundaries. The next issue to resolve is

whether the annual permit fee is so prejudicial or unfair to FMC that it cannot be enforced under the comity analysis in *Marchington*.

The scope of the Tribes jurisdiction depends on its source. If the source is the second *Montana* exception, the permit fee must have some relationship to the Tribe's obligation to protect the health and safety of Tribal members. Here, the EPA is undertaking a substantial role in protecting the Tribes. From the discussion above, the EPA's containment program is not fail-safe, and the Tribes are reasonable in their desire to provide an additional level of protection to supplement the EPA's program. Having jurisdiction under the second *Montana* exception, the Tribes are authorized to assess a permit fee that has some nexus to the costs of supplementing the EPA's program to fully protect the health and safety of Tribal members. Yet the Tribes have never explained why an annual fee of $1.5 million is necessary to provide that supplemental protection. For example, what are the monitoring or containment costs that the Tribes expect to incur to shore up the weak points in the EPA's program? There may be legitimate reasons justifying the Judgment amount, but they have never been explained, and FMC has never had an opportunity to address them. Under *Marchington's* comity analysis, it would be unfairly prejudicial to enforce the permit fee imposed by the Tribal Appellate Court under the second *Montana* exception.

This conclusion changes when the Judgment is examined under the first *Montana* exception. Under *Montana's* first exception, Tribal jurisdiction is based on the consensual relationship between FMC and the Tribes. FMC agreed to obtain a use permit under the Amendments to Chapter V of the Fort Hall Land Use Operative Policy

Guidelines, and pay a $1.5 million annual fee for that permit. What was FMC consenting to under those regulations? FMC agreed to obtain a permit to "store" hazardous waste "which may remain at the site for a perpetual period of time." *See Chapter V § 9-1(1)(A)(xiii).* Moreover, as discussed above, FMC agreed that its obligation would extend beyond three identified ponds and encompass all wastes at the plant.

Thus, FMC agreed to pay the annual permit fee for as long as it stored the waste on the site. The EPA has estimated that it will spend $47 million over 30 years to clean up FMC's mess. That is just over $1.5 million a year, about the same sum as FMC agreed to pay, an indication that the $1.5 million sum is neither exorbitant nor unfair.

FMC argues that its obligation to pay the fee should end when it closed its plant, but there is nothing in the negotiations or series of letters that conditions the annual fee on the FMC plant being operational. This absence was certainly noticed (or should have been noticed) by FMC's attorneys, but FMC never attempted to negotiate any modifications to add such a condition. FMC was anxious to obtain the permit along with the Consent Decree, and so the inevitable delays that would result from negotiations over an expiration date would have been unacceptable to FMC. After all, the Consent Decree allowed FMC to dump the toxic mess it had created in the EPA's lap by paying a small fine of $11.9 million along with a few million dollars in construction commitments. That was a sweetheart deal and FMC was desperate to grab it. FMC's arguments that its cadre of attorneys had no idea that they were agreeing to a permit fee with no expiration date is ludicrous.

For all of these reasons, the Judgment passes *Marchington's* comity analysis under *Montana's* first exception.

## CONCLUSION

Based on the analysis above, the Court makes the following findings as a matter of law: (1) The Tribes have jurisdiction over FMC under *Montana's* first and second exceptions to impose a requirement that FMC obtain a permit to store waste within the Reservation and charge a fee for that permit; (2) The Tribal judicial process generally, and the Tribal Appellate Court Judgment specifically, did not violate FMC's due process rights; (3) Under *Montana's* first exception, the Tribal Appellate Court properly exercised its jurisdiction to impose a $1.5 million annual permit fee for as long as the hazardous waste is stored within the Reservation; (4) Under *Montana's* second exception, the Tribal Appellate Court failed to properly exercise its jurisdiction when it did not explain why $1.5 million was needed each year to protect against the threat posed by FMC's storage of hazardous waste within the Reservation.

Based on these findings, the Court will (1) grant the Tribes' motion to enforce the Judgment under *Montana's* first exception; (2) grant in part the Tribes' motion to enforce the Judgment under *Montana's* second exception, finding that the Tribes had jurisdiction under *Montana's* second exception, but refusing to enforce the Judgment on this ground because the Tribes failed to explain why $1.5 million was needed annually; (3) grant in part the Tribes' motion for summary judgment on the due process and enforcement issues, finding no due process violation, and finding that the Judgment shall be enforced

under *Montana's* first exception but not the second exception; and (4) deny FMC's

motion for declaratory judgment and an injunction against enforcing the Judgment

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED that the Tribes' motion to

enforce the Judgment under *Montana's* first exception (docket no. 64) is GRANTED.

IT IS FURTHER ORDERED, that the motion to enforce the Judgment under

*Montana's* second exception (docket no. 65) is GRANTED IN PART AND DENIED IN

PART. It is granted to the extent it seeks a ruling that the Tribes had jurisdiction over

FMC under *Montana's* second exception to impose an annual permit fee to store

hazardous waste within the Reservation, but is denied to the extent it seeks to enforce the

Judgment of an annual permit fee of $1.5 million, for the reasons discussed above.

IT IS FURTHER ORDERED, that the motion for summary judgment on due

process and to enforce judgment (docket no. 66) is GRANTED IN PART AND DENIED

IN PART. It is granted to the extent it seeks a ruling that there was no due process

violation, that jurisdiction was proper under both *Montana* exceptions, and that the

Judgment is enforceable under *Montana's* first exception, but is denied to the extent it

seeks a ruling that the Judgment is enforceable under *Montana's* second exception.

IT IS FURTHER ORDERED, that FMC's motion for declaratory judgment and

permanent injunction (docket no. 67) is DENIED.

IT IS FURTHER ORDERED, that the Court will issue a separate Judgment as

required by Rule 58(a).



DATED: September 28, 2017

B. Lynn Winmill
Chief Judge
United States District Court