**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FMC CORPORATION,<br>*Plaintiff-Appellant/<br>Cross-Appellee,*<br><br>v.<br><br>SHOSHONE-BANNOCK<br>TRIBES,<br>*Defendant-Appellee/<br>Cross-Appellant.* | Nos. 17-35840<br>17-35865<br><br>D.C. No.<br>4:14-cv-00489-BLW<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted May 17, 2019
Seattle, Washington

Filed November 15, 2019

Before: Michael Daly Hawkins and William A. Fletcher,
Circuit Judges, and David C. Bury,* District Judge.

Opinion by Judge W. Fletcher

---

* The Honorable David C. Bury, United States District Judge for the
District of Arizona, sitting by designation.

**SUMMARY**[**]

---

### Tribal Court Jurisdiction

The panel affirmed the district court's judgment enforcing a judgment of the Shoshone-Bannock Tribal Court of Appeals, which ruled that FMC Corporation must pay an annual use permit fee for storage of hazardous waste on fee lands within the Shoshone-Bannock Fort Hall Reservation, as required under a consent decree settling a prior suit brought against FMC by the Environmental Protection Agency under the Resource Conservation and Recovery Act.

The panel held that the tribal court had regulatory and adjudicatory jurisdiction over the Shoshone-Bannock Tribes' suit against FMC under two "*Montana* exceptions." Under the first exception, a tribe may regulate the activities of nonmembers who enter into consensual relationships with the tribe or its members. Under the second *Montana* exception, a tribe retains inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. The panel held that, under the first *Montana* exception, the Tribes had regulatory jurisdiction to impose the permit fees because FMC entered into a consensual relationship when it signed a permit agreement with the Tribes. The panel held that FMC's conduct of storing hazardous waste on its fee lands within the reservation fell within the second *Montana* exception. The panel held

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that the district court erred in refusing, as a matter of comity, to enforce the judgment of the Tribal Court of Appeals under the second exception. The panel held that, in addition to regulatory jurisdiction, the Tribes had adjudicatory jurisdiction.

The panel also held that the Tribal Court of Appeals did not deny FMC due process through a lack of impartiality.

---

## COUNSEL

Gregory G. Garre (argued), Elana Nightingale Dawson, and Genevieve P. Hoffman, Latham & Watkins LLP, Washington, D.C.; Ralph H. Palumbo, Yarmuth Wilsdon PLLC, Seattle, Washington; Lee Radford, Parsons Behle & Latimer, Idaho Falls, Idaho; Maureen L. Mitchell, Fox Rothschild LLP, Seattle, Washington; for Plaintiff-Appellant/Cross-Appellee.

Douglas B. L. Endreson (argued) and Frank S. Holleman, Sonosky Chambers Sachse Endreson & Perry LLP, Washington, D.C.; William F. Bacon, Shoshone-Bannock Tribes, Fort Hall, Idaho; Paul C. Echo Hawk, Echo Hawk Law Office, Pocatello, Idaho; for Defendant-Appellee/Cross-Appellant.

Case: 4:14-cv-00489-BLW Document 113 Filed 11/15/19 Page 4 of 56

4      FMC CORP. V. SHOSHONE-BANNOCK TRIBES

**OPINION**

W. FLETCHER, Circuit Judge:

For over 50 years, FMC Corporation ("FMC") operated an elemental phosphorus plant on fee land within the Shoshone-Bannock Fort Hall Reservation ("Reservation") in Idaho. FMC's operations produced approximately 22 million tons of hazardous waste that is currently stored on the Reservation. The waste is radioactive, carcinogenic, and poisonous.

In 1990, the U.S. Environmental Protection Agency ("EPA") declared FMC's plant and storage area, together with an adjoining off-reservation plant owned by J.R. Simplot, a Superfund Site under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). In 1997, the EPA further charged FMC with violating the Resource Conservation and Recovery Act ("RCRA"). A Consent Decree settling the RCRA suit required FMC to obtain permits from the Shoshone-Bannock Tribes ("the Tribes"). FMC and the Tribes negotiated an agreement under which FMC agreed to pay $1.5 million per year for a tribal use permit allowing storage of hazardous waste. FMC paid the annual use permit fee from 1998 to 2001 but refused to pay the fee in 2002 after ceasing active plant operations. FMC has continued to store the hazardous waste on the Reservation despite its failure to pay the use permit fee.

The Tribes sued FMC in Tribal Court, seeking *inter alia* payment of the annual $1.5 million use permit fee for waste storage. Under *Montana v. United States*, 450 U.S. 544 (1981), there are two potentially relevant bases for tribal

jurisdiction in this case—two of the three so-called "*Montana* exceptions." First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565. Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566. After years of litigation, the Tribal Court of Appeals held in 2014 that the Tribes have regulatory and adjudicatory jurisdiction over FMC under both *Montana* exceptions. The court held that FMC owed $19.5 million in unpaid use permit fees for hazardous waste storage from 2002 to 2014, and $1.5 million in annual fees going forward.

After the decision of the Tribal Court of Appeals, FMC sued the Tribes in federal district court. FMC argued that the Tribes did not have jurisdiction under either of the *Montana* exceptions; that the Tribal Court of Appeals denied FMC due process because two judges on the Tribal Court of Appeals were biased against FMC; and that the judgment by the Tribal Court of Appeals was unenforceable. The Tribes counterclaimed, seeking an order recognizing and enforcing the judgment of the Tribal Court of Appeals. The district court held that the Tribes had regulatory and adjudicatory jurisdiction under both *Montana* exceptions, that the Tribal Court of Appeals had not denied FMC due process, and that the Tribal Court of Appeals' judgment was entitled to comity, and was therefore enforceable, under the first but not the second *Montana* exception.

FMC appeals the district court's judgment in favor of the Tribes. The Tribes cross-appeal the district court's decision that the Tribal Court of Appeals' judgment is not enforceable under the second *Montana* exception.

We affirm the judgment of the district court. We hold that the judgment of the Tribal Court of Appeals is enforceable under both *Montana* exceptions.

## I. Factual and Procedural Background

The Shoshone-Bannock Tribes are a federally recognized Indian tribe comprising the eastern and western bands of the Northern Shoshone and the Bannock, or Northern Paiute, bands. The Tribes are organized under the Indian Reorganization Act of 1934, 25 U.S.C. §§ 5101 et seq., and are governed by the Fort Hall Business Council, a legislative body consisting of seven elected members. Shoshone-Bannock Tribes, *Tribal Government*, http://www2.sbtribes.com/government (last visited Sept. 19, 2019). The ancestral lands of the Tribes included land in present-day Idaho, Oregon, Nevada, Utah, Wyoming, Montana, and parts of Canada. *See* Shoshone-Bannock Tribes, http://www2.sbtribes.com/about (last visited Sept. 19, 2019). Pursuant to the Fort Bridger Treaty of 1868, 15 Stat. 673, and related executive orders, the Tribes today have sovereign authority over the Fort Hall Reservation. The Fort Hall Reservation originally encompassed approximately 1.8 million acres, or 2,800 square miles. *See id.* The Reservation now encompasses approximately 544,000 acres, or 840 square miles, in what is now southeastern Idaho. Ninety-seven percent of the Reservation is tribal land or land held in trust by the United States for the benefit of the Tribes

and their members.  Approximately three percent of the Reservation is fee land owned by non-members.

### A.  FMC's Phosphorus Plant, Consent Decree, and Permit Fees

From 1949 to 2001, FMC Corporation and its predecessors owned and operated an elemental phosphorus production plant occupying 1,450 acres.  Virtually all of the property is fee land on the Fort Hall Reservation.  FMC's plant was the largest elemental phosphorus plant in the world. FMC Idaho, *Plant History*, http://fmcidaho.com/plant-history (last visited Sept. 19, 2019).  For most of its operation, FMC obtained or mined raw materials for its plant from tribal and allottee lands on the Reservation.  *See*, *e.g.*, *id*.

Hazardous waste from the plant's 52 years of operation contaminates FMC's land on the Reservation.  Approximately 22 million tons of hazardous waste are stored in waste storage ponds on the site.  Some storage ponds are capped.  Some are not.  Some ponds are lined.  Some are not.  Phosphorus, arsenic, and other hazardous materials contaminate an additional 1 million tons of loose soil and groundwater throughout the site.  Millions of tons of slag containing radioactive materials contaminate the site.  Somewhere between twenty one and thirty railroad tanker cars containing toxic phosphorous sludge are buried on the property.  There is no lining underneath the tanker cars and no cap above them.  As will be described in greater detail below, the hazardous waste in the storage ponds, tanker cars, soil, groundwater, and air at the site is radioactive, carcinogenic, and poisonous.

In 1990, EPA declared the FMC plant, as well as an adjoining off-reservation plant owned by a different company, J.R. Simplot, as a National Priority List Superfund Site—the "Eastern Michaud Flats" site—under CERCLA. *See* 55 Fed. Reg. 35502, 35507. The National Priorities List is a list of the nation's "worst hazardous waste sites." EPA, *Superfund Cleanup Process*, https://www.epa.gov/superfund/superfund-cleanup-process (last visited Sept. 19, 2019).

In 1997, EPA charged FMC with violating RCRA. RCRA regulates the disposal of solid and hazardous waste. To avoid litigation, FMC began negotiations with the EPA over the terms of a possible Consent Decree that would settle the RCRA suit. Though not a formal party, the Tribes participated in the negotiations. Among other measures, the proposed RCRA Consent Decree required construction of a treatment facility and additional waste storage ponds on FMC's fee land on the Reservation. As a condition to obtaining the Consent Decree, the EPA required FMC to obtain relevant permits from the Tribes. *See* Consent Decree, Case No. 4:98-cv-00406-BLW (D. Idaho, July 13, 1998).

Pursuant to the Tribes' Land Use Policy Ordinance ("LUPO" or "Ordinance") and associated Guidelines, the relevant tribal permits included a building permit for construction of the treatment facility and waste storage ponds, and a use permit for storage of the hazardous waste. FMC and the Tribes met in July 1997 to discuss the permits. During negotiations, FMC consented to tribal jurisdiction. *See, e.g.*, Letter from the Land Use Policy Commission to FMC (Aug. 6, 1997) (stating that following the July meeting, "We understood that FMC would recognize tribal jurisdiction within the exterior boundaries of the Fort Hall Indian

Reservation."); Letter from J. Paul McGrath, Senior Vice President and General Counsel and Secretary of FMC, to the Fort Hall Business Council, Shoshone-Bannock Tribes (Oct. 30, 1997) (stating "[i]n connection with the land use permit, we did agree that we would consent to tribal jurisdiction in that area"). FMC applied for the building and use permits in August 1997.

While negotiations were proceeding, the Tribes considered and then adopted amended LUPO Guidelines for storage of hazardous waste on the Reservation. The Tribes finalized the amended Guidelines in April 1998. The amended Guidelines required an annual use permit for storage of hazardous waste on the Reservation, with an annual fee of $5.00 per ton. Money from use permit fees was to be "deposited in the Shoshone-Bannock Hazardous Waste Management Program Fund," and to be used "to pay the reasonable and necessary costs of administrating the Hazardous Waste Management Program." Amendments to Chapter V: Fort Hall Land Use Operative Policy Guidelines, § V-9-2(B) (1998).

The Land Use Policy Commission ("LUPC" or "Commission"), the Tribes' administrative and enforcement body for the Ordinance, notified FMC of the amended Guidelines. FMC estimated that the $5 per ton storage fee would cost over $110 million per year. FMC sought to negotiate a compromise with the Tribes. *FMC Corp. v. Tribes*, No. 4:14-CV-489-BLW, 2017 WL 4322393, at *2 (D. Idaho Sept. 28, 2017).

In May and June 1998, the Tribes and FMC negotiated an agreement under which FMC agreed to a one-time fee of $1 million and an annual use permit fee of $1.5 million to

cover FMC's storage of its hazardous waste on the Reservation. *See* Letter from LUPC to FMC (May 19, 1998). The parties agreed that FMC was required to obtain a use permit and to pay the $1.5 million fee even if FMC capped and closed the eleven hazardous waste ponds that were subject to the RCRA Consent Decree (the "RCRA ponds"). *See id.* (stating that FMC agreed to pay the annual use permit fee "beginning on June 1, 1999, and for every year thereafter"); Letter from J. Paul McGrath, Senior Vice President and General Counsel and Secretary of FMC, to LUPC (June 2, 1998) ("[I]t is our understanding that the permit covers the plant and that the $1.5 million annual fee would continue to be paid for the future even if the use of ponds 17–19 was terminated in the next several years."); Affidavit of Robert J. Fields, Division Manager of FMC (Oct. 20, 2000) (stating that he participated in the negotiations with the Tribes and that the June 2, 1998 letter from FMC was intended to confirm FMC's shared understanding that the use permit covered the entire facility and that FMC's agreement to pay $1.5 million per year would not end when Ponds 17, 18 and 19 were closed pursuant to the Consent Decree). FMC paid its first fee on June 1, 1998.

A few months later, FMC and the EPA agreed to a Consent Decree to settle the RCRA suit. *FMC Corp. v. Tribes*, 2017 WL 4322393 at *3. Paragraph 8 of the Consent Decree memorialized the Decree's requirement that FMC obtain permits from the Tribes: "Where any portion of the Work requires a . . . tribal permit or approval, [FMC] shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals." *See* Consent Decree, No. 4:98-CV-00406-BLW, ¶ 8 (D. Idaho July 13, 1998).

Pursuant to the Consent Decree, FMC agreed to pay a fine to the U.S. government of $11.9 million, to install a range of upgrades in its handling of waste, and to cap nine of the eleven RCRA ponds covered by the Consent Decree. *FMC Corp. v. Tribes*, 2017 WL 4322393 at *3. Between 1999 and 2005, FMC capped and/or closed the RCRA ponds. *Id.* at *4. In 2005, FMC certified that the last of the RCRA ponds had been capped and/or closed.

## B. Prior Federal Court Proceedings

From 1998 to 2001, FMC paid the Tribes the annual use permit fee of $1.5 million pursuant to its 1998 agreement with the Tribes. In December 2001, FMC stopped all active phosphorus processing operations at the site. When the $1.5 million use permit fee came due in 2002, FMC refused to pay it.

After negotiations failed, the Tribes filed a motion in the RCRA Consent Decree action in federal district court, seeking a declaration that FMC was required by the Consent Decree to obtain tribal permits for waste storage on the Reservation. *Id.* The district court held that "(1) the Tribes had jurisdiction over FMC under the first *Montana* exception . . . , (2) FMC was required to apply for Tribal permits based on FMC's agreement to submit to tribal jurisdiction in ¶ 8 of the RCRA Consent Decree, (3) the Tribes were intended third-party beneficiaries of the Consent Decree and therefore had a right to enforce its terms, and (4) FMC was required to exhaust tribal remedies over any challenges to the Tribal permit decisions." *FMC Corp. v. Tribes*, 2017 WL 4322393 at *4; *see United States v. FMC*, No. CV-98-0406-E-BLW, 2006 WL 544505 (D. Idaho 2006).

On appeal from the district court, we addressed only the third of the district court's holdings. We held that the Tribes were incidental rather than intended beneficiaries of the Consent Decree and therefore had no right to judicial enforcement of the Decree. *United States v. FMC*, 531 F.3d 813, 815 (9th Cir. 2008). We remanded to the district court with instructions to dismiss the Tribes' suit. *Id.* at 824. However, we noted that during the pendency of the appeal to our court "FMC began the process of applying for tribal permits, which is the main relief that the Tribes have sought in this action." *Id.* at 823. We explicitly noted and relied on a representation by FMC. We wrote:

> At oral argument, the Tribes expressed their concern that, if we were to hold that the Tribes lack standing to enforce the Consent Decree, FMC would withdraw its permit applications and undo the progress made to date on the proper resolution of this dispute. In response to questioning from the panel, FMC's lawyer represented to the court that FMC understands that it has the obligation to continue, and will continue, with the current tribal proceedings to their conclusion. We accept that statement from counsel as binding on FMC.

*Id.* at 823–24.

### C.  Tribal Proceedings

In 2006, after entry of the district court's order but while FMC's aforementioned appeal to our court was still pending, FMC applied to the Tribes' Land Use Policy Commission for

a building permit for demolition activities and a use permit for continued storage of the waste.  Following notice and a public hearing, the Commission granted FMC's applications for the two permits.  *See* Findings of Fact and Decision on FMC Application for Building Permit for Activities at the FMC Pocatello Plant (Land Use Policy Commission, Apr. 25, 2006); Findings of Fact and Decision on FMC Application for Special Use Permit for Activities at the FMC Pocatello Plant (Land Use Policy Commission, Apr. 25, 2006).  The Commission concluded that it had regulatory jurisdiction under both *Montana* exceptions to require FMC to obtain the permits.   The Commission assessed a one-time building permit fee at $3,000 for demolition activities during that year.  The Commission also assessed FMC's use permit fee for storage of hazardous waste at the previously agreed $1.5 million annual rate.  The Commission provided, as an alternative, that FMC could choose to pay the higher $5 per ton fee based on the weight of the waste stored on FMC's property on the Reservation, pursuant to the Tribes' amended Guidelines.  *Id.*

FMC appealed the Commission's decision to the governing body of the Tribes, the Fort Hall Business Council ("Council").  On July 21, 2006, the Council affirmed the Commission's decision. Fort Hall Business Council Decision Regarding FMC's Appeals of the April 25, 2006 Land Use Permit Decisions (July 21, 2006).  On February 8, 2007, the Commission issued a "letter resolution" setting the use permit fee at the agreed-upon $1.5 million.  FMC again appealed the Commission's decision to the Council.  On June 14, 2007, the Council affirmed the Commission's decision.

FMC appealed the Council's and the Commission's decisions to the Tribal Court.  (The Shoshone-Bannock tribal

14      FMC Corp. v. Shoshone-Bannock Tribes

court system consists of a trial court and an appellate court—the "Tribal Court" and the "Tribal Court of Appeals.") The Tribal Court held *inter alia* that, pursuant to the Tribes' laws, the Tribes were required to submit their Land Use Policy Guidelines and the Hazardous Waste Management Act of 2001, upon which the tribal use permit requirement was premised, to the Secretary of the Interior for approval. *FMC Corp. v. Shoshone-Bannock Tribes' Fort Hall Business Council and Land Use Policy Commission*, Case Nos. C-06-0069, C-07-0017, C-07-0035 (Shoshone-Bannock Tribal Court, Civil Division, May 21, 2008). The Tribal Court found that the Guidelines and the Act had not been approved by the Secretary of the Interior, and therefore, were unenforceable as a matter of tribal law.

In June 2008, the Tribes and FMC cross-appealed to the Tribal Court of Appeals. The members of that court were Judges Fred Gabourie, Mary Pearson, and Cathy Silak. None of them is a member of the Shoshone-Bannock Tribes. Judge Gabourie is a former California state court judge, former Chief Judge for the Kootenai Tribe of Idaho, and a former prosecutor and city attorney. Judge Pearson is a former Chief Judge for the Spokane Tribe and the Coeur d'Alene Tribe. Judge Silak is a former Justice of the Idaho Supreme Court.

1. Conference Remarks by Judges Gabourie and Pearson

While the case was pending before the Tribal Court of Appeals, Judges Gabourie and Pearson spoke at a conference entitled "Tribal Courts: Jurisdiction and Best Practices" convened by the University of Idaho College of Law on March 23, 2012. In the audience were law students, tribal court practitioners, other lawyers, and members of the public.

The conference was videotaped.  FMC's counsel attended the judges' presentation.

Judge Gabourie described the manner in which tribal appellate court decisions come before federal courts, and he noted that very few federal court judges have experience with tribes.  He stated that "every court has—should be impartial" and "a good opinion comes [from] both sides, both parties. Because both parties rely on a good opinion, strong opinion." He stated that a tribal appellate court decision should discuss the tribe's tradition and culture so that judges in the federal system have some context when they read the decision.  He stated that an appellate judge has a responsibility to remand the case for testimony from expert witnesses if there is a weakness in the record.  He discussed limitations on tribes' sovereign powers under current law, and how, in light of Supreme Court decisions like *Montana*, "which has just been murderous to Indian tribes," it is important for tribes to support good appellate courts that can issue strong opinions in the event issues are heard in a federal court.  He discussed *Nevada v. Hicks*, 533 U.S. 353 (2001), and *Strate v. A-1 Contractors*, 520 U.S. 438 (1997), noting that the tribal appellate court decisions had not been good, and that, as a result, the U.S. Supreme Court did not have vital information about the tribes' cultures and traditions.

Judge Pearson discussed the importance of tribal attorneys creating a record at the tribal trial court level.  She stated tribal attorneys should involve the tribe in the "big cases."  She noted that they had a big case at that moment that they knew was "going to go up," so they were saying prayers, reading cases, and "trying to do . . . the history."  She described *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201 (9th Cir. 2001), as a case where the tribal lawyers had effectively

16    FMC CORP. V. SHOSHONE-BANNOCK TRIBES

laid out the history for the tribal trial and appellate courts.
She discussed the importance of this responsibility—how
"[you] just need to make sure that you do the job
right"—since non-Indian federal judges were reviewing the
decisions.

In response to questions, Judge Gabourie discussed the
value of anthropologists and scientists testifying in tribal
court cases. He stated that the use of experts in *Bugenig* was
a model for tribes seeking to protect their sovereignty,
traditions, and cultures. Expanding on his earlier discussion
of experts, Judge Gabourie stated:

> You know, there's one area, too, there are
> tribes that have had mining and other
> operations going on, on the reservation, you
> know, and then the mining company or
> whatever, manufacturing company,
> disappears. They leave, you know. They've
> . . . either dug everything they could, and then
> the ground is disturbed, sometimes polluted
> beyond repair. And you sit as . . . an appellate
> court justice, and you're starting to read the
> cases that come down from the tribal court.
> And you're saying to yourself, you know, we
> know that . . . there's pollution, that the food
> that they're eating is polluted, the water's
> polluted, but nobody proved it. And while
> John Jones said that it is polluted, you know,
> John Jones don't count. But the tribal courts
> have got to realize that you need expert
> witnesses. You need chemists and whatever
> to get out of testifying. It may cost a little, but

FMC CORP. V. SHOSHONE-BANNOCK TRIBES     17

> so the appellate court is in a position of
> remanding that case back and say "do it."
>
> You know, you made—and you're really
> being fair to both sides. . . . That's why you
> need the expert witnesses to cover those loose
> ends, you know, so when it finally goes to
> the—whatever circuit it may go to, they can
> see that there's been some experts testifying
> on behalf.  Maybe experts that testify on
> behalf of the mining company, but experts
> nonetheless.  Well, you can be damn sure that
> the mining company's going to spend the
> money to protect their interest, you know.
>
> So the appellate courts have got to step in and
> in their own way, make a good, balanced
> decision, a hundred-percenter for both sides,
> but be sure to protect the tribe.  And that's my
> own opinion, that last sentence.

Judge Pearson clarified, "We're not guaranteeing anybody anything."  Judge Pearson advised the audience:

> Well, I encourage you to get the *Bugenig*
> handouts, because it's really important.  If
> you're a law student and you're going to
> practice law, as well as if you're a judge and
> you're going to be hearing cases, you know
> where—companies come on the reservations
> and do business for X number of years and
> they dirty up your groundwater and your other
> things, and they go out of business.  And they
> leave you just sitting.  And you need to know

18      FMC CORP. V. SHOSHONE-BANNOCK TRIBES

what you can do as you're sitting as a judge
with those cases coming toward you.

### 2. Decisions of the Tribal Court of Appeals

Just over a month later, on May 8, 2012, the Tribal Court
of Appeals issued an opinion holding *inter alia* that (1) the
Tribes have regulatory and adjudicatory jurisdiction over
FMC under the first *Montana* exception to require FMC to
obtain a building permit for demolition and construction, and
a use permit for hazardous waste storage, and to require FMC
to pay the agreed-upon annual use permit fee of $1.5 million;
(2) the use permit fee was authorized by and enforceable
under tribal law, because, *inter alia*, the Land Use Policy
Ordinance and the Hazardous Waste Management Act were
both approved by the Secretary of the Interior consistent with
tribal law; and (3) the Tribal Court erred in failing to consider
whether the Tribes have jurisdiction under the second
*Montana* exception. The court issued an amended order on
June 26, 2012. *FMC Corp. v. Shoshone-Bannock Tribes
Land Use Dep't and Fort Hall Bus. Council*, Amended, Nunc
Pro Tunc Findings of Fact, Conclusions of Law, Opinion and
Order, Case Nos. C-06-0069, C-07-0017, C-07-0035
(Shoshone-Bannock Tribal Court of Appeals, June 26, 2012)
("Tribal Court of Appeals, June 2012 Opinion").

On January 10, 2013, pursuant to a state-court order under
the Idaho Public Records Act, FMC obtained a videotape of
Judges Gabourie and Pearson's remarks at the law school
conference. In April 2013, Judges Peter McDermott and
Vern Herzog Jr. replaced Judges Gabourie and Pearson on the
Tribal Court of Appeals. Judge McDermott is a retired Idaho
state district court judge. Judge Herzog is a practicing

attorney. Neither is a member of the Shoshone-Bannock Tribes. Judge Silak remained on the court.

On May 6, 2013, FMC filed briefs asking the reconstituted Tribal Court of Appeals to reconsider its prior rulings on the ground that the statements by Judges Gabourie and Pearson showed bias against FMC. In an order dated May 28, 2013, the Tribal Court of Appeals revised its earlier ruling on an issue unrelated to the questions now before us. It upheld its earlier rulings on all other issues. The court ordered an evidentiary hearing to resolve the question previously left open—whether the Tribes had regulatory and adjudicatory jurisdiction over FMC under the second *Montana* exception.

From April 1 to April 15, 2014, the Tribal Court of Appeals held an evidentiary hearing on the second *Montana* exception. Judge Silak was not available for the hearing. Judge John Traylor replaced Judge Silak. Judge Traylor is a practicing attorney. He is not a member of the Shoshone-Bannock Tribes. Judges McDermott and Herzog remained on the court. Following the hearing, the Tribal Court of Appeals made factual findings and held that the Tribes had regulatory and adjudicatory jurisdiction under the second *Montana* exception. *See Shoshone-Bannock Tribes Land Use Dep't and Fort Hall Bus. Council v. FMC Corp.*, Opinion, Order, Findings of Facts and Conclusions of Law (Shoshone-Bannock Tribal Court of Appeals, May 16, 2014) ("Tribal Court of Appeals, May 2014 Opinion"); *see also Shoshone-Bannock Tribes Land Use Dep't and Fort Hall Bus. Council v. FMC Corp.*, Statement of Decision (Shoshone-Bannock Tribal Court of Appeals, Apr. 15, 2014) ("Tribal Court of Appeals, Statement of Decision").

20      FMC Corp. v. Shoshone-Bannock Tribes

In 2012, prior to the decision of the Tribal Court of Appeals, the EPA had issued an Interim Amendment to the Record of Decision ("IRODA") under CERCLA addressing the FMC Operable Unit ("OU") of the Eastern Michaud Flats Superfund Site. *See* EPA, *Interim Amendment to the Record of Decision for the EMF Superfund Site, FMC Operable Unit, Pocatello, Idaho* (Sept. 2012) ("*IRODA*"). The IRODA replaced an earlier 1998 Record of Decision ("ROD"). EPA concluded that it needed to issue the IRODA because the human health and environmental threats at the FMC site were greater than anticipated, there were "immediate" threats to human health and the environment, and EPA "no longer considered" the 1998 ROD "protective of human health and the environment." *IRODA* at v, 14, 52; *see also id.* at ii, 16, 20.

The IRODA noted the particular dangers of the elemental phosphorus present at the FMC site: Elemental phosphorus is an "ignitable and reactive waste" that has "physical properties unlike most contaminants of concern . . . encountered in environmental response actions." *Id.* at iii. Due to these characteristics, elemental phosphorus "requires special handling techniques not only for routine handling but also for emergency response." *Id.* The IRODA noted that the remedial work completed under the RCRA Consent Decree was independent of the remedial work that remained to be done under CERCLA. *Id.* at v.

The IRODA outlined an extensive, multi-part "interim amended remedy" to be implemented on the FMC site. The IRODA included the following remedial measures: (1) place evapotranspiration caps over eight "remediation areas" on the Reservation containing "non-slag fill (such as elemental phosphorous, phossy solids, precipitator solids, . . . )," *id.*;

(2) place "approximately 12 inches of soil cover over areas containing slag fill, ore stockpiles, and the former Bannock Paving areas to prevent [] exposure to gamma radiation and fugitive dust," *id.* at iii–iv; (3) "[c]lean underground reinforced concrete pipes that contain elemental phosphorous and radionuclides," *id.* at iv; (4) "[i]nstall an interim groundwater extraction/treatment system to contain contaminated groundwater, thereby preventing contaminated groundwater from migrating beyond the FMC OU and into the Simplot OU and/or adjoining springs or the Portneuf River," *id.*; (5) "[i]mplement a long-term groundwater monitoring program to evaluate the performance of the soil and groundwater remedial actions," *id.*; and (6) "[i]mplement a gas monitoring program at the FMC OU capped ponds (also referred to as the *CERCLA Ponds* to distinguish them from the RCRA-regulated ponds) and subsurface areas where elemental phosphorous is present to identify potential phosphine and other potential gas generation at concentrations that could pose a risk to human health," *id.* (emphasis in original).

In its brief to us, FMC wrote, "The IRODA—which remains in effect today—requires an additional set of remedial actions that EPA has concluded are appropriate and *fully* 'protective of human health and the environment.'" (emphasis added.) FMC's brief misrepresents what the EPA wrote. The EPA did not write that the interim remedial measures described in the IRODA would be "fully" protective. Here is what the EPA wrote in the IRODA, specifying that the remedial measures are "interim" (which FMC's brief failed to mention), and not using the word "fully" (which FMC's brief supplied):

22      FMC Corp. v. Shoshone-Bannock Tribes

> The measures in this selected *interim* amended remedy will be *protective of human health and the environment*, comply with federal and state/tribal requirements that are applicable or relevant and appropriate within the scope of the selected interim amended remedy, and result in cost-effective action and utilize permanent solutions and alternative treatment (or resource recovery) technologies to the maximum extent practicable.

*IRODA* at v (emphasis added to indicate words quoted in FMC's brief).

The IRODA went on to specify:

> Because the selected interim amended remedy will result in hazardous substances, pollutants, or contaminants remaining on the FMC OU above levels that allow for unrestricted use and unlimited exposure, a statutory review will be conducted within 5 years after initiation of the remedial action, and every 5 years thereafter to ensure that the interim amended remedy is or will [sic] protect human health and the environment.

*Id.* at vi.

The Tribal Court of Appeals' factual findings were based in substantial part on the IRODA, and on earlier orders by the EPA, whose factual findings were not contested by FMC. *See e.g.*, Tribal Court of Appeals, May 2014 Opinion, at 6 n.2. The Tribal Court of Appeals found that "FMC created

and continues to store millions of tons of toxic waste on its fee land within Reservation boundaries." *Id.* at 5. This hazardous waste includes (1) as much as 16,000 tons of elemental phosphorus that leaked into the soil during production and now contaminates approximately 780,000 cubic yards of soil weighing approximately 1 million tons; (2) elemental phosphorus that is "suspended in contaminated water" and contained in 23 waste storage ponds on the site; (3) "phosphine gas," which is produced when elemental phosphorus is exposed to water; (4) approximately 21 tanker rail cars that were used to ship hazardous elemental phosphorous sludge and are now buried in unlined soil on the site; and (5) groundwater contaminated with arsenic and phosphorus that flows into important ground and surface water resources on the Reservation. *Id.* at 5–7 (citing *IRODA* at 7–9). "The site was also filled and graded using millions of tons of slag that contains radioactive materials which emit gamma radiation in excess of EPA's human health safety standards." *Id.* at 6 (citing *IRODA* at 7–9).

The Tribal Court of Appeals found that FMC's creation and storage of this hazardous waste on the Reservation creates "an ongoing and extensive threat to human health" and threatens the "welfare and cultural practices of the Tribes and their members." *Id.* at 5. "The elemental phosphorus in the soil and in containment ponds [on] FMC's land is reactive, meaning that it will burst into flames when exposed to oxygen." *Id.* at 6 (citing *IRODA* at 77). "The phosphorus itself is toxic when ingested, inhaled or absorbed." *Id.* (citing *IRODA* at 78). Phosphine gas, which "is harmful and even deadly to humans at certain levels," has been released from the site at dangerous levels. *Id.* at 7 (citing *IRODA* at 77). The tanker rail cars buried at the site contained "from 200 to 2,000 tons of elemental phosphorus sludge, 10–25% of which

remained in each of the tankers at the time they were buried" because FMC concluded cleaning them was "dangerous" to employees. *Id.* at 7–8. These tankers remain in the ground today, and "it is possible that they either have or will corrode to the point of leakage." *Id.* "Arsenic and phosphorus from the site are continuously flowing in the groundwater from FMC's land through seeps and springs directly into the Portneuf River and Fort Hall Bottoms." *Id*. at 8. This groundwater contamination "negatively affects the ecosystem and subsistence fishing, hunting and gathering by tribal members at the River, as well as the Tribes' ability to use this important resource as it has been historically used for cultural practices, including the Sundance." *Id.*

The Tribal Court of Appeals stated that "FMC does not challenge" that the hazardous materials present at the FMC site "do pose a threat" to the Tribes. *Id.* at 9. "Rather, [FMC] contends that if certain methods suggested by the EPA are undertaken and properly implemented by FMC in the future, the risk will be contained." *Id.* But the court found that EPA itself continues to view FMC's site as dangerous to public health and welfare. For example, in 2013, a year after the issuance of the IRODA, the EPA wrote that hazardous waste at the FMC site "may constitute an imminent and substantial endangerment to public health or welfare or the environment." *Id.* (quoting EPA, *Unilateral Admin. Order for Remedial Design and Remedial Action*, No. CERCLA-10-2013-0116, at 9–10 (June 10, 2013)). Further, the court wrote, "Although the EPA has been involved at this site since 1990, remedial actions chosen by the EPA have not been implemented" and many "proposed remedial actions are still in design phase only." *Id.* "EPA's IRODA is itself only an interim measure." *Id.* "[A] final Record of Decision will not be available for five to ten years." *Id.* (citing *IRODA* at 19).

"EPA's plans remain just that: Plans." *Id.* In addition, "EPA's plans are containment plans," which would keep the hazardous wastes on the Reservation "for the indefinite future." *Id.*

The Tribal Court of Appeals held that the Tribes had regulatory and adjudicatory jurisdiction over FMC under the second *Montana* exception. It concluded that FMC's storage of millions of tons of toxic waste on the Reservation poses a serious threat, and has a direct effect on, "the political integrity, the economic security or the health or welfare of the [Tribes]." *See* Tribal Court of Appeals, May 2014 Opinion at 14–15; Tribal Court of Appeals, Statement of Decision at 29–32. The Court concluded that this threat "is real; it is not a mere potential," and is a threat of catastrophic consequences to the Tribes. Tribal Court of Appeals, May 2014 Opinion, at 11.

On May 16, 2014, the Tribal Court of Appeals issued a final judgment, holding FMC liable for an annual use permit fee of $1.5 million. *See Shoshone-Bannock Tribes Land Use Dep't and Fort Hall Bus. Council v. FMC Corp.*, Judgment and Order for Attorney Fees and Costs, May 16, 2014. The court assessed FMC $19,500,000 for unpaid permit fees for 2002–2014; $928,220.50 in attorneys' fees; and $91,097.91 in costs, for a total judgment of $20,519,318.41. *Id.*

### D. Federal District Court Proceedings

In November 2014, FMC filed a complaint in the United States District Court for the District of Idaho, requesting that the district court deny enforcement of the judgment of the Tribal Court of Appeals. The Tribes counterclaimed, seeking an order enforcing the judgment.

The district court granted the Tribes' motion to enforce the judgment. The court concluded that the Tribes had jurisdiction over FMC under both *Montana* exceptions. The district court rejected FMC's due process challenge based on the alleged bias of Judges Gabourie and Pearson on the first panel of the Tribal Court of Appeals. The court noted that the reconstituted panel reconsidered the rulings of the first panel and, in relevant part, independently reached the same conclusions.

The district court enforced the judgment in its entirety under the first *Montana* exception. However, the court denied comity under the second *Montana* exception on the ground that there was insufficient nexus between the $1.5 million annual permit fee and the costs of tribal programs required to mitigate the threat from the storage of FMC's hazardous waste on the Reservation. The court concluded that the second *Montana* exception was therefore not a ground on which the judgment could be enforced.

The present appeal followed. FMC argues that the Tribes lacked jurisdiction over FMC under both *Montana* exceptions, and that FMC was denied due process. The Tribes cross-appeal, arguing that the district court erred in finding that the judgment was not enforceable under the second *Montana* exception.

II. Appellate Jurisdiction and Standard of Review

We have appellate jurisdiction under 28 U.S.C. § 1291.

"We have . . . recognized that because tribal courts are competent law-applying bodies, the tribal court's determination of its own jurisdiction is entitled to 'some

deference.'" *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 808 (9th Cir. 2011) (quoting *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313 (9th Cir. 1990)). "As we consider questions of tribal jurisdiction, we are mindful of 'the federal policy of deference to tribal courts' and that '[t]he federal policy of promoting tribal self-government encompasses the development of the entire tribal court system, including appellate courts.'" *Id.* at 808 (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16–17 (1987)); *see also United States v. Wheeler*, 435 U.S. 313, 332 (1978) (recognizing that "tribal courts are important mechanisms for protecting significant tribal interests").

We review de novo tribal courts' legal rulings on tribal jurisdiction, and we review for clear error tribal courts' factual findings underlying their jurisdictional rulings. *Big Horn Cty. Elec. Coop., Inc. v. Adams*, 219 F.3d 944, 949 (9th Cir. 2000); *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 904 (9th Cir. 2002).

We review de novo the district court's summary judgment decision on the due process claim. *Big Horn Cty.*, 219 F.3d at 949.

## III.  Discussion

The core question in this appeal is whether we should recognize and enforce the Shoshone-Bannock Tribal Court of Appeals' final judgment holding FMC liable for an annual use permit fee of $1.5 million.

"As a general rule, federal courts must recognize and enforce tribal court judgments under principles of comity." *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d at 903 (citing

*Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997)). In some circumstances, however, we will not recognize and enforce a judgment. *Id.* First, we will not recognize and enforce a judgment if the tribal court did not have both personal and subject matter jurisdiction. *Id.* Second, we will not enforce a judgment if the tribal court denied due process to the losing party. *Id.* Further, "[u]nder limited circumstances, . . . [we] may refuse to recognize or enforce a tribal judgment on equitable grounds as an exercise of discretion." *Id.*

FMC argues we should not enforce the judgment of the Shoshone-Bannock Tribal Court of Appeals for two reasons. First, FMC argues the Tribes lacked subject matter jurisdiction over FMC. Second, FMC argues it was denied due process of law because two judges of the Tribal Court of Appeals were biased against it.

Unless we hold that the Shoshone-Bannock Tribal Court of Appeals lacked subject matter jurisdiction or denied FMC due process, we "must enforce the tribal court judgment without reconsidering issues decided by the tribal court." *Id.* at 903–04 (citing *Iowa Mut. Ins. Co.*, 480 U.S. at 19 ("Unless a federal court determines that the Tribal Court lacked jurisdiction . . . proper deference to the tribal court system precludes relitigation of issues . . . resolved in the Tribal Courts.")). We "may not readjudicate questions—whether of federal, state or tribal law—already resolved in tribal court absent a finding that the tribal court lacked jurisdiction or that its judgment be denied comity for some other valid reason." *Id.* at 904.

We address each of FMC's arguments in turn. We hold that the Tribes had regulatory and adjudicatory jurisdiction

under both *Montana* exceptions to impose and enforce the permit fees.  We further hold that there was no due process violation.  Finally, we hold that the final judgment of the Shoshone-Bannock Tribal Court of Appeals is entitled to recognition and enforcement under principles of comity under both *Montana* exceptions.

## A.  Subject Matter Jurisdiction

We first determine whether the Shoshone-Bannock Tribal Court of Appeals had subject matter jurisdiction over the Tribes' claims against FMC.  To make that determination, we must answer two related questions.  First, did the Tribes have regulatory jurisdiction to impose the permit fees?  Second, did the Tribes have adjudicatory jurisdiction to enforce those fees in tribal court?  *See, e.g.*, *Water Wheel*, 642 F.3d at 809 ("To exercise its inherent civil authority over a defendant, a tribal court must have [] subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction . . . ."); *see also Knighton v. Cedarville Rancheria of N. Paiute Indians*, 922 F.3d 892, 899 (9th Cir. 2019) (quoting the same).  For the reasons that follow, we hold that the Tribes had both regulatory and adjudicatory jurisdiction.

### 1.  Regulatory Jurisdiction

The case before us concerns nonmember conduct on non-Indian-owned fee land within the boundaries of the Reservation.  We therefore apply the Supreme Court's framework set forth in *Montana v. United States*, 450 U.S. 544 (1981), to determine whether the Tribes had regulatory jurisdiction to impose permit fees on FMC.  *See Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 898 (9th Cir. 2017), *as amended* (Aug. 3, 2017) (explaining that "[o]ur

30      FMC Corp. v. Shoshone-Bannock Tribes

caselaw has long recognized two distinct frameworks for
determining whether a tribe has jurisdiction over a case
involving a non-tribal-member defendant: (1) the right to
exclude, which generally applies to nonmember conduct on
*tribal land*; and (2) the exceptions articulated in *Montana v.
United States*, 450 U.S. 544 (1981), which generally apply to
nonmember conduct on *non-tribal land*." (emphasis added)).

   In *Montana*, the Supreme Court held that there are three
bases for tribal regulatory jurisdiction over nonmember
activities on non-Indian fee land within the boundaries of a
reservation—the so-called *Montana* exceptions.  450 U.S.
at 565–66 ("Indian tribes retain inherent sovereign power to
exercise some forms of civil jurisdiction over non-Indians on
their reservations, even on non-Indian fee lands."); *Bugenig
v. Hoopa Valley Tribe*, 266 F.3d 1201, 1209–10 (9th Cir.
2001) (en banc) (discussing the same); *see also Iowa Mut.
Ins. Co.*, 480 U.S. at 18 ("Tribal authority over the activities
of non-Indians on reservation lands is an important part of
tribal sovereignty."); *Attorney's Process & Investigation
Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d
927, 934–35 (8th Cir. 2010) (briefly discussing some of the
historical scope of tribal sovereignty and changes over time).
*Cf. Worcester v. Georgia*, 31 U.S. 515, 557 (1832) (Tribes are
"distinct political communities, having territorial boundaries,
within which their authority is exclusive, and having a right
to all the lands within those boundaries, which is not only
acknowledged, but guaranteed by the United States.").

   First, a tribe retains the inherent sovereign authority to
"regulate, through taxation, licensing, or other means, the
activities of nonmembers who enter consensual relationships
with the tribe or its members, through commercial dealing,
contracts, leases or other arrangements."  450 U.S. at 565.

Second, a tribe "retain[s] inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566. Third, a Tribe may regulate the conduct of nonmembers on non-Indian fee land when that regulation is expressly authorized by federal statute or treaty. *See Strate*, 520 U.S. at 445; *Montana v. U.S. EPA*, 137 F.3d 1135, 1140 (9th Cir. 1998). There is a presumption against tribal jurisdiction over nonmember activity on non-Indian fee land. *Bugenig*, 266 F.3d at 1209–10; *see Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008). The Tribes bear the burden of rebutting that presumption. *Plains Commerce Bank*, 554 U.S. at 330.

Only the first two jurisdictional bases are relevant here. We examine them in turn.

### a. First *Montana* Exception

The first *Montana* exception provides that tribes have jurisdiction to "regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members," including consensual relationships "through commercial dealing, contracts, leases or other arrangements." *Montana*, 450 U.S. at 565–66; *see also Strate*, 520 U.S. at 446. The Supreme Court has recognized that permit requirements and permit fees constitute a form of regulation. *See Morris v. Hitchcock*, 194 U.S. 384 (1904) (recognizing tribal jurisdiction to require non-members to obtain permits and pay a permit fee in order to graze livestock on reservation).

For purposes of determining whether a consensual relationship exists, "consent may be established 'expressly or by [the nonmember's] actions.'"  *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 338). The test is not subjective.  Rather, it is "whether under th[e] circumstances the non-Indian defendant should have reasonably anticipated that [its] interactions might 'trigger' tribal authority." *Id.* at 817–18 (quoting *Plains Commerce Bank*, 554 U.S. at 337) (stating also "[t]he Supreme Court has indicated that tribal jurisdiction depends on what non-Indians 'reasonably' should 'anticipate' from their dealings with a tribe or tribal members on a reservation.").

FMC entered a consensual relationship with the Tribes, both expressly and through its actions, when it negotiated and entered into an permit agreement with the Tribes, requiring annual use permits and an annual $1.5 million permit fee to store 22 million tons of hazardous waste on the Reservation. As the district court noted, FMC then "affirmed its consensual relationship with the Tribes by signing the Consent Decree, which required FMC to obtain Tribal permits." *FMC Corp. v. Tribes*, 2017 WL 4322393 at *9. "FMC then cited its consensual relationship with the Tribes" to the district court and our court "as part of its argument that the Decree should be approved." *Id.*  The conduct that the Tribes seek to regulate through the permit fees at issue—the storage of hazardous waste on the Reservation—arises directly out of this consensual relationship. *See Knighton*, 922 F.3d at 904 ("*Montana*'s consensual relationship exception requires that 'the regulation imposed by the Indian tribe have a nexus to the consensual relationship itself.'" (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001))).

FMC argues this consensual relationship was "coerced" because EPA required FMC to obtain relevant permits from the Tribes in order to obtain a Consent Decree to settle EPA's RCRA-based claims against FMC. FMC may indeed have been "coerced" in the sense that the EPA required it to obtain tribal permits as a condition for obtaining a Consent Decree. However, the "coercion," if it can be called that, came from FMC's strong interest in obtaining a Consent Decree that would allow it to settle the RCRA suit on favorable terms.

FMC was highly motivated to obtain the Consent Decree proffered by the EPA. In the words of the district court, "[T]he Consent Decree allowed FMC to dump the toxic mess it had created in the EPA's lap by paying a small fine of $11.9 million along with a few million dollars in construction commitments. That was a sweetheart deal and FMC was desperate to grab it." *FMC Corp. v. Tribes*, 2017 WL 4322393 at *13. Faced with a choice between years of litigation, on the one hand, and a "sweetheart deal" that required FMC to pay a small fine and obtain tribal permits whose terms were already known, on the other, FMC chose to consent to tribal jurisdiction. The district court wrote, "This was a simple business deal . . . ." *Id.* at *10. It was "not the product of illegal duress or coercion." *Id.*

We fail to see why a strong interest in obtaining a particular result is "coercion" that invalidates an agreement designed to achieve that desired result. Further, to the extent that there was some kind of "coercion," it was "coercion" by the EPA. It was the EPA that insisted on tribal permits as a condition to agreeing to enter into the Consent Decree. As the district court observed, the Tribes simply "took advantage of their bargaining leverage, a long-standing practice in the

sharp-elbowed corporate world in which FMC does business every day." *Id.*

Moreover, FMC should have reasonably anticipated that its interactions might "trigger" tribal regulatory authority. *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 338). FMC "is no stranger" to the Tribes' governance and laws or to the Tribes' regulatory and adjudicatory jurisdiction. *Knighton*, 922 F.3d at 904. FMC has operated on the Reservation for over 50 years and has had an extensive relationship with the Tribes for 70 years. That relationship includes a long history of "commercial dealing[s], contracts, leases, and other arrangements" with the Tribes, including mining leases, contracts for the supply of phosphate shale, agreements recognizing the Tribes' taxing power, royalty payments, and employment and permit agreements. *Montana*, 450 U.S. at 565–66; *see also FMC v. Shoshone-Bannock Tribes*, 905 F.2d at 1312 (9th Cir. 1990) (discussing FMC's extensive mining operations on the Reservation to supply the phosphate shale needed to produce phosphorus at FMC's facility).

Based on FMC's history on the Fort Hall Reservation, we have previously held that FMC had entered into a consensual relationship with the Tribes. In 1990, in *FMC v. Shoshone-Bannock Tribes*, we held that the Tribes had regulatory jurisdiction over FMC's activities on its fee land within the Reservation such that the Tribes could require FMC to comply with the Tribes' Tribal Employment Rights Ordinance. 905 F.2d 1311. Enacted by the Tribes in 1980, the Ordinance required employers on the Reservation, including non-Indian employers operating on fee land, to give mandatory preferences in hiring, contracting, and subcontracting to Indians. *Id.* at 1312. FMC initially

objected to application of the Ordinance to its phosphorus production plant, the same plant at issue here. *Id.* But there, as here, "[a]fter negotiations with the Tribes, FMC entered into an employment agreement based on the TERO in 1981 that resulted in a large increase in the number of Indian employees at FMC." *Id.* at 1312–13.

In 1986, "the Tribes became dissatisfied with FMC's compliance with the employment agreement," and after attempts to negotiate failed, the Tribes filed suit in Tribal Court. *Id.* at 1313. There, as here, FMC argued the Tribes lacked regulatory and adjudicatory jurisdiction over FMC. *Id.* The Tribal Court held the Tribes had jurisdiction over FMC and concluded that FMC had violated the Ordinance. *Id.* The Tribal Court of Appeals affirmed. *Id.* When the parties could not agree on a compliance plan, the Tribal Court of Appeals entered its own compliance plan and levied an annual fee of approximately $100,000 against FMC. *Id.*

We held that the Tribes had jurisdiction over FMC under *Montana*'s first exception. We wrote:

> FMC has certainly entered into consensual relationships with the Tribes in several instances. Most notable are the wide[-]ranging mining leases and contracts FMC has for the supply of phosphate shale to its plant. FMC also explicitly recognized the Tribes' taxing power in one of its mining agreements. FMC agreed to royalty payments and had entered into an agreement with the Tribes relating specifically to the TERO's goal of increased Indian employment and training. There is also the underlying fact that its plant

> is within reservation boundaries, although, significantly, on fee and not on tribal land. In sum, FMC's presence on the reservation is substantial, both physically and in terms of the money involved.

*Id.* at 1314.

We therefore conclude that the Tribes had regulatory jurisdiction under *Montana*'s first jurisdictional basis to impose the permit fees based on FMC's consensual relationship with the Tribes.

### b. Second *Montana* Exception

Under *Montana*'s second exception, the Tribes must demonstrate that FMC's conduct on its fee lands within the Reservation "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Under the second exception, a tribe "may quite legitimately seek to protect its members from noxious uses that threaten tribal welfare or security, or from nonmember conduct on the land that does the same." *Plains Commerce Bank*, 554 U.S. at 336. Threats to tribal natural resources, including those that affect tribal cultural and religious interests, constitute threats to tribal self-governance, health and welfare. *See, e.g.*, *id.* at 333; *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 441 (1989); *Montana v. U.S. EPA*, 137 F.3d at 1139, 1141 ("We have previously recognized that threats to water rights may invoke inherent tribal authority over non-Indians. A tribe retains the inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct

threatens or has some direct effect on the health and welfare of the tribe. This includes conduct that involves the tribe's water rights. . . . [D]ue to the mobile nature of pollutants in surface water it would in practice be very difficult to separate the effects of water quality impairment on non-Indian fee land from impairment on the tribal portions of the reservation: A water system is a unitary resource. The actions of one user have an immediate and direct effect on other users.") (internal quotation marks and citations omitted).

To establish jurisdiction under *Montana*'s second exception, the nonmember's activities "must do more than injure the [Tribes]." *Plains Commerce Bank*, 554 U.S. at 341. The activities must "imperil the subsistence or welfare" of the tribal community. *Montana*, 450 U.S. at 566; *accord Plains Commerce Bank*, 554 U.S. at 341; *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1306 (9th Cir. 2013).

Tribal jurisdiction under the second *Montana* exception may exist concurrently with federal regulatory jurisdiction. *See* Tribal Court of Appeals, May 2014 Opinion, at 5 (discussing the same). As we have explained previously, there is "no suggestion" in the *Montana* case law that "inherent [tribal] authority exists only when no other government can act." *Montana v. U.S. EPA*, 137 F.3d at 1141.

We conclude that FMC's storage of millions of tons of hazardous waste on the Reservation "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare" of the Tribes to the extent that it "imperil[s] the subsistence or welfare" of the Tribes.

38     FMC Corp. v. Shoshone-Bannock Tribes

*Montana*, 450 U.S. at 566.  We base our conclusion on the factual findings of the Tribal Court of Appeals, the factual findings and conclusions of the EPA, expert testimony presented in the Tribal Court of Appeals, and the record as a whole.  The record contains extensive evidence of toxic, carcinogenic, and radioactive substances at the FMC site.  We highlight here only two sources of contamination and the threats they pose to the Tribes: elemental phosphorus in the ground, and phosphine gas in the air.

i.  Elemental Phosphorus in the Ground

Millions of tons of "ignitable-reactive elemental phosphorus," "high concentrations of arsenic," and gamma radiation contaminate the soil at the FMC site.  EPA, *2013 Unilateral Admin. Order for Remedial Design and Remedial Action*, CERCLA No. 10-2013-0116, at 7 (June 10, 2013) ("2013 *UAO*").  "The elemental phosphorus contamination within the FMC OU alone is at a scale unprecedented anywhere in the United States . . . ." *IRODA* at 83.  As much as 16,000 tons of elemental phosphorus saturate the ground, extend in a plume at least 85 feet below ground, and contaminate approximately 780,000 cubic yards of soil weighing 1 million tons.  *IRODA* at 21, 78, 83.  This calculated amount of phosphorus does not include elemental phosphorus-contaminated wastes that currently sit in ponds on the FMC site, the elemental phosphorus waste that has migrated or been blown off-site, and the unknown amount of waste that is contained in buried rail tanker cars that may corrode and leak.  *IRODA* at 9, 14, 83.  The elemental phosphorus contamination at the FMC site poses a serious threat to human health, the environment, and the welfare of the Tribes.  In the EPA's words, elemental phosphorus at the FMC site exists "in concentrations exceeding 1,000 parts per

million (ppm)" in the soil and "will present a significant risk to human health and the environment should exposure occur." *IRODA* at ii; *see also id.* at 34 ("[R]isks from exposure to ignitable elemental phosphorus are severe and highly certain should direct exposure occur.").

The EPA concluded that the elemental phosphorus at the FMC site constitutes a "principal threat waste." *IRODA* at ii, 77–78. "Principal threat wastes are those source materials considered to be highly toxic or highly mobile that generally cannot be reliably contained or would present a significant risk to human health or the environment should exposure occur." *Id.* at ii–iii. Elemental phosphorus "is highly toxic by ingestion, inhalation, and skin absorption"; "may be fatal at high concentrations; is corrosive to skin and other living tissue"; "is likely to cause skin burns upon contact"; and is pyrophoric, meaning it will spontaneously burst into flames when exposed to the air, producing phosphine and other toxic gases. *Id.* at 77–78. Exacerbating the threat, elemental phosphorus "has physical properties that are unlike most [contaminants of concern] encountered in environmental response actions," requiring "special handling techniques not only for routine handling but also for emergency response." *Id.* at iii, 77–78; *see also id.* at 28 (concluding that elemental phosphorus at the FMC site "could ignite, causing burns and inhalation hazards from intensely irritating phosphoric acid aerosols with potential to drift beyond the immediate area."). "The threat of elemental phosphorus was vividly described by Claudeo Bronco, [a witness before the Tribal Court of Appeals,] who testified that he [saw] ducks spontaneously ignite as they took off from FMC's phosphorus containment ponds." Tribal Court of Appeals, May 2014 Opinion, at 6–7.

The EPA's CERCLA plan calls for FMC to place evapotranspiration caps over areas contaminated with elemental phosphorus. *IRODA* at 68. However, despite the EPA's involvement at the site since 1990 when the EPA first declared the plant a Superfund Site, many areas of the site, including the area where the tanker railroad cars are buried, still had not been capped at the time of the 2014 hearing before the Tribal Court of Appeals. Further, as the EPA wrote, capping "does not reduce [the] toxicity, mobility, or volume of contaminants." *Id.* at 60. Even if capped, phosphorus-contaminated soil will remain on the Reservation indefinitely and continue to present a threat to Tribal health and welfare.

### ii. Phosphine Gas in the Air

Phosphine gas produced from elemental phosphorus stored in ponds on FMC's site poses a constant threat to the Tribes. Phosphine gas is "very flammable," "highly reactive," and "extremely toxic" to humans. Letter from Kai Elgethun, Idaho Dep't of Health and Welfare to Greg Weigel, EPA Idaho Operations Office, at 2–3 (June 1, 2010) ("Letter from Idaho Dep't of Health and Welfare"); EPA, *Unilateral Admin. Order for Removal Action*, *FMC Idaho LLC*, CERCLA No. 10-2010-0170, at 9 (June 14, 2010) ("2010 *UAO*"); *see also* Expert Witness Testimony from Dr. Jerrold Leikin and Dr. Peter Orris, members of EPA's Supplemental Environmental Project 14 for the FMC Site (discussing the dangers of phosphine gas and the FMC site in particular). Phosphine gas is "immediately dangerous to life and health" at concentrations of 50 parts per million ("ppm"). 2010 *UAO* at 9. It burns spontaneously upon contact with air and explodes at concentrations at or near 20,000 ppm. *Id.*; *see also* Expert Witness Testimony of Dr. Jerrold Leikin

(describing phosphine as a "knockdown gas," meaning a few breaths can render a person unable to walk or talk, and can result in extreme harm or eventual death). The short-term upper limit for human exposure is 1 ppm for 15 minutes of exposure. 2010 *UAO* at 9.

There are eleven RCRA waste ponds on FMC's property that are supervised under the Consent Decree. Nine of those ponds were capped between 1999 and 2005. *See* 2010 *UAO* at 8; *FMC Corp. v. Tribes* at *4. The other two were left uncapped. *Id.* at 9–10. Dangerous levels of phosphine gas build up beneath the evapotranspiration caps on the capped ponds and are released from the uncapped ponds. *Id.* Although the EPA has ordered FMC to implement measures to contain the gas, releases continue to occur.

In 2006 and 2010, for example, the EPA entered Unilateral Administrative Orders ("UAO") responding to phosphine gas releases from capped and uncapped RCRA ponds. *See* EPA, *Unilateral Admin. Order for Removal Actions*, *FMC Idaho LLC*, CERCLA No. 10-2007-0051 (Dec. 14, 2006) ("2006 *UAO*"); 2010 *UAO* at 10–11 (noting that in 2005, 2006, 2007, and 2009, levels of phosphine gas in the air around the RCRA ponds were high enough that workers in the area either had to delay work or leave the area for their safety).

The EPA reported in its 2006 UAO that phosphine gas releases had been detected at RCRA Pond 16S. In June 2006, "intermittent emissions of smoke" from two temperature monitoring points ("TMP") had been observed at the pond. 2006 *UAO* at 10. Subsequently, "[v]isible air emissions from Pond 16S [were] observed on a number of occasions [after] June 2006, including by Shoshone-Bannock Tribal staff on

September 6, 2006 and September 18, 2006." *Id.* FMC had reported to the EPA that phosphine gas was collecting in TMP well casings at Pond 16S, and was "likely accumulating to the phosphine auto-ignition concentration (20,000 parts per million) inside the temperature well casings or vents." *Id.* The EPA concluded that "[t]he conditions at the Site constitute[d] an imminent and substantial endangerment to public health or welfare or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a)." *Id.* at 13–14 (stating also that the conditions "constitute a threat to public health or welfare or the environment"). The EPA issued a "time critical Action Memorandum on December 13, 2006 for Pond 16S to remove and treat phosphine and other gases at levels of concern . . . ." *Id.* at 12–13.

Dr. Peter Orris testified before the Tribal Court of Appeals that he "absolutely" agreed with the EPA's findings and conclusions in the 2006 UAO. He testified that the phosphine gas was "both acutely and chronically dangerous to people in the area or downstream, if you will, or downwind." "Phosphine gas [is a] close cousin to the phosgene gas used in World War I . . . that gassed all the soldiers, so that a high dose short-term exposure can kill people. . . . This is pretty catastrophic stuff."

The EPA reported in its 2010 UAO that "[p]hosphine gas ha[d] been detected in and around TMPs and in ambient air at a number of the RCRA Ponds." 2010 *UAO* at 9. In late 2009, FMC detected phosphine levels above 1 ppm near Pond 15S, triggering alarms downwind and requiring evacuations on November 2, 23, and 27, and on December 22. *Id.* at 11. In December 2009 to April 2010, FMC detected concentrations of phosphine gas as high as 23,000 ppm inside

a lift station associated with Pond 15S.  *Id.*  Daily monitoring from February to April 2010 measured phosphine gas in "ambient air," at breathing zone height, ranging from 0 to at least 20 ppm.  *Id.* at 12.  The actual concentrations may have been much higher.  The EPA reported, "[O]n numerous occasions the monitors [] 'pegged out' at 20 ppm," the upper detection limit for FMC's monitors, "indicating some unknown concentration higher than 20 ppm."  *Id.*  Another phosphine survey on April 30, 2010, "provided phosphine readings that averaged 300 ppm" in another area of the pond.  *Id.*

FMC first reported the issues with Pond 15S to the EPA in a letter dated April 14, 2010.  *Id.* at 11.  In response to an EPA request for information, FMC sent the EPA monitoring data from all the RCRA ponds on April 26, 2010.  *Id.* at 12.  The data indicated that phosphine concentrations in the ambient air around two more ponds—one capped and one uncapped—were at or near the upper detection limit for FMC's monitors.  *Id*. (Ponds 8E and 17); *see id.* at 8 for a list of capped and uncapped RCRA ponds.

On June 1, 2010, shortly before the EPA's release of its 2010 UAO, Dr. Kai Elgethun of the Idaho Department of Health and Welfare wrote: "We conclude that the phosphine gas being released from Pond 15S is an urgent public health hazard to the health of people breathing the air in the proximity of Pond 15S . . . ."  Letter from Idaho Dep't of Health and Welfare at 1.  Pond 15S is approximately 400 meters south of a road and 600 meters south of an interstate highway that crosses the Reservation.  *Id.* at 3.

The EPA wrote in the 2010 UAO: "Action is necessary to protect receptors from inhalation of phosphine at RCRA

Ponds, and to minimize the risk of fire and explosion from high concentrations of phosphine gas at the RCRA Ponds." 2010 *UAO* at 14. "Receptors," in the jargon of the EPA, are individuals who may be exposed to phosphine gas. The EPA wrote that "receptors" included individuals "at or near the facility boundaries," such as railroad and power company workers, bicyclists and pedestrians on "old Highway 30," and "members of the Shoshone-Bannock Tribes." *Id*. at 13. The EPA concluded in 2010, as it had in 2006, that the "[h]igh concentrations of phosphine accumulating within the [FMC] RCRA Ponds and being released" "constitute an imminent and substantial endangerment to public health or welfare or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a)." *Id*. at 13–15. The EPA issued a "time critical removal Action Memorandum on June 11, 2010, for Ponds 8E, 15S and 17 and the other RCRA Ponds, requiring air monitoring and action to remove and treat phosphine gas . . . ." *Id.* at 13.

David Reisman, a former EPA official who worked at the EPA for thirty-six years, including several years at the FMC site, testified before the Tribal Court of Appeals that the threat of phosphine gas being released from the FMC site—both onsite and offsite—is "always there." Reisman testified that when he visited the FMC site and walked on the caps on the RCRA ponds he observed visually that "they were not well maintained." He testified further, "I think the data bears out that there is moisture and air getting under the cap, and mixing with the waste stream in one fashion or another." Reisman noted that some phosphine gas is already escaping because of the nature of the evapotranspiration cap. He testified that at a landfill site near Las Vegas, repeated downpours of rain had caused part of an evapotranspiration cap to slide off the landfill, exposing the waste. If the caps at

the FMC site were to similarly crack or slide off, Reisman testified, massive clouds of phosphine gas at lethal exposure levels would be released.

Reisman testified that proper monitoring to detect releases of phosphine gas was not being done at the FMC site. According to Reisman, monitoring remained "a big question mark" under the 2012 IRODA. *See also* Testimony of Rob Hartman, Vice President of FMC Idaho (discussing how a monitoring plan for phosphine gas "has not been developed"). Reisman testified that FMC does not have an early warning system in place, stating that he "hope[d] that all parties would look into some early warning system in case some of the catastrophic events would occur." Another expert witness described the monitoring at the FMC site as "completely inadequate."

The record establishes that FMC's RCRA ponds on the Reservation continue to generate lethal amounts of phosphine gas that accumulate beneath the pond covers. As the district court wrote, this phosphine gas "pose[s] a constant and deadly threat to the Tribes" and "a real risk of catastrophic consequences should containment fail." *FMC Corp. v. Tribes*, 2017 WL 4322393 at *11.

### iii. FMC's Arguments

FMC makes two arguments in its brief against jurisdiction under the second *Montana* exception. Both arguments fail.

First, FMC argues that the hazardous waste on its site is contained, is "actively monitored by FMC and EPA," and poses little danger to the Tribes. FMC writes, "The record does not remotely support jurisdiction under the second

*Montana* exception." FMC's argument fails to take into account what is actually in the record.

The hazardous waste at the FMC site constitutes a serious and continuous threat. The district court summarized:

> [T]he EPA has taken substantial steps to contain the toxic waste and prevent harm. But the threat remains. . . . Because the EPA intends to leave the waste on the site indefinitely, and because the waste's toxicity has such a long life—decades if not longer—there is a real risk that no matter how well its containment system is designed, the system may fail. . . . EPA reports demonstrate that the waste sites are not reservoirs of passive liquid that can be contained with a simple dam. Instead, these sites are generating lethal gases that accumulate under pressure beneath the pond covers. In other words, they pose a constant and deadly threat to the Tribes, a real risk of catastrophic consequences should containment fail. And despite the best efforts of the EPA, there have releases of these toxic gases. . . . This dangerous threat can only be contained, not removed or treated. . . . It is so toxic that there is no safe way to remove it, ensuring that it will remain on the Reservation for decades.

*FMC Corp. v. Tribes*, 2017 WL 4322393 at *10–11.

Second, FMC argues that our decision in *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298

(9th Cir. 2013), compels the conclusion that the Tribes lack jurisdiction. *Evans* is light years away from the case before us. In *Evans*, we held that the Tribes' Land Use Policy Commission did not have jurisdiction under the second *Montana* exception to require a nonmember to obtain tribal permits for the construction of a single-family home. We held that the Tribes had not established that the construction of one single-family home on fee land in an area of the Reservation that already "contain[ed] many residential properties owned and inhabited by nonmembers"—unlike the area in *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408 (1989), which was closed to the general public—threatened or had some direct effect on the political integrity, economic security, or the health or welfare of the Tribes. *Id.* at 1303–06. In stark contrast to *Evans*, the threats from the FMC site, as Dr. Orris testified, "are not minimal annoyances. They are the threat of catastrophic health reactions, including death."

### iv.  Nexus

The district court held that due to the extensive contamination at the FMC site, the Tribes had established jurisdiction under the second *Montana* exception. However, as a matter of comity, the court refused to enforce the judgment of the Tribal Court of Appeals under the second exception. In the view of the court, the Tribes had failed to sufficiently explain the connection between the $1.5 million annual permit fee and the threat posed by the hazardous waste. Citing *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997), the court wrote:

> Having jurisdiction under the second *Montana*
> exception, the Tribes are authorized to assess

> a permit fee that has some nexus to the costs
> of supplementing the EPA's program to fully
> protect the health and safety of Tribal
> members.    Yet the Tribes have never
> explained why an annual fee of $1.5 million is
> necessary to provide that supplemental
> protection.

*FMC Corp. v. Tribes*, 2017 WL 4322393 at *12.

The district court was mistaken in holding that the Tribes had jurisdiction under the second *Montana* exception and, at the same time, holding that the Tribal Court of Appeals' judgment was not entitled to comity.  The nexus question is part of the jurisdictional question.  Once jurisdiction is established, lack of nexus is not a ground for denying comity under *Marchington*.

We take it as a given that there must be some nexus between a basis for jurisdiction under *Montana* and a tribal action taken in the exercise of that jurisdiction.  For example, if the Tribes had insisted under the second *Montana* exception that FMC disinvest from its businesses in China, such insistence would have been an unreasonable exercise of jurisdiction.  However, there is nothing in *Montana* requiring that nexus be narrowly defined.  There is nothing, for example, requiring the Tribes to show that the $1.5 million annual use permit fee be spent on supplemental measures, beyond those now being taken by the EPA, to protect against hazards posed by FMC's hazardous waste.  There is evidence in the record suggesting that the Tribes have spent approximately $1.5 million annually on measures to monitor and mitigate the dangers posed by FMC's hazardous waste, and indeed that the Tribes might spend more if funds were

available.  But we need not rely on that evidence alone to find nexus.

A more-than-sufficient nexus may be shown by comparing fees charged on the open market for hazardous waste storage, on the one hand, to the $1.5 million annual fee charged by the Tribes, on the other.  FMC's own evidence in the Tribal Court of Appeals showed that as of 1995, commercial hazardous waste disposal facilities charged between $50 and $250 per ton for bulk disposal (the type of materials typically disposed of at FMC's facility).  Given the extreme danger posed by FMC's hazardous waste, it is an open question whether anyone could be persuaded to accept its waste at any price.  But assuming that someone would be willing to accept FMC's hazardous waste, and using a midrange fee of $150 per ton, the one-time fee for disposing of FMC's 22 million tons of hazardous waste would be $3.3 billion.  Compared to $3.3 billion, an annual fee of $1.5 million is an extraordinary bargain.

Although we conclude that the Tribes can establish nexus in this case by showing that they charge less than the open market fee for comparable activity, we do not mean thereby to suggest that a tribe in some circumstances might not be able to charge substantially more than an open market fee, or might not be able to forbid waste storage or other activities entirely.  We need not hypothesize cases not before us.  It is enough for current purposes to show that there is a more-than-sufficient nexus between the storage of FMC's highly dangerous—potentially catastrophically dangerous—waste and the $1.5 million annual use permit fee to warrant the assessment of that fee under *Montana*'s second exception.

### 2.  Adjudicatory Jurisdiction

A tribe's adjudicatory jurisdiction over nonmembers may not exceed its regulatory jurisdiction. *Strate*, 520 U.S. at 453; *Water Wheel*, 642 F.3d at 814 (noting that the Supreme Court has "articulated the general rule that a tribe's adjudicative jurisdiction may not exceed its regulatory jurisdiction"). However, the Supreme Court has never decided whether a Tribe's adjudicatory jurisdiction is necessarily as extensive as its regulatory jurisdiction. *See Water Wheel*, 642 F.3d at 816. Where as here, we hold that the Tribes had regulatory jurisdiction, we are thus presented with the question of whether they also had adjudicatory jurisdiction.

The Court has held that "where tribes possess authority to regulate the activities of nonmembers, 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts.'" *Strate*, 520 U.S. at 453 (citation omitted); *see also Iowa Mut. Ins. Co.*, 480 U.S. at 18 ("Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty.  Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." (internal citations omitted)); *Knighton*, 922 F.3d at 906 (discussing the same); *Water Wheel*, 642 F.3d at 814 (discussing the same).  In two recent cases—both involving nonmember conduct on tribal land—we have held that tribes had adjudicatory jurisdiction.  *See Knighton*, 922 F.3d at 906–07; *Water Wheel*, 642 F.3d at 814–16.  In both cases, we based our holding on the existence of regulatory jurisdiction, the nature of the tribal sovereign interests, long-standing principles of Indian law, and congressional interest in tribal self-government.  Based on those same factors, we conclude that the Shoshone-Bannock Tribal Court of Appeals had

adjudicatory jurisdiction over the Tribes' claims in this case. *See Knighton*, 922 F.3d at 907 (concluding the same); *Water Wheel*, 642 F.3d at 816 (concluding the same). As we stated in *Water Wheel*, "Any other conclusion would impermissibly interfere with the tribe's inherent sovereignty, contradict long-standing principles the Supreme Court has repeatedly recognized, and conflict with Congress's interest in promoting tribal self-government." 642 F.3d at 816.

## B. Due Process

We held in *Wilson v. Marchington* that a federal court must "reject a tribal judgment if the defendant was not afforded due process of law." 127 F.3d at 811. "Due process, as that term is employed in comity, . . . [requires] that there has been opportunity for a full and fair trial before an impartial tribunal that conducts the trial upon regular proceedings after proper service or voluntary appearance of the defendant, and that there is no showing of prejudice in the tribal court or in the system of governing laws." *Id.* Comity, however, "does not require that a tribe utilize judicial procedures identical to those used in the United States Courts." *Id.* We must "be careful to respect tribal jurisprudence" as well as tribes' customs and traditions. *Id.* "Extending comity to tribal judgments is not an invitation for [us] to exercise unnecessary judicial paternalism in derogation of tribal self-governance." *Id.* "However, the tribal court proceedings must afford the defendant the basic tenets of due process or the judgment will not be recognized by the United States." *Id.* FMC argues it was denied due process. We disagree.

FMC's primary argument is that two judges on the Tribal Court of Appeals—Judges Gabourie and Pearson—were not

impartial. In support of its argument, FMC cites the judges'
remarks at the conference sponsored by the University of
Idaho College of Law. FMC's argument fails for two
reasons.

First, Judges Gabourie and Pearson did not make any
statements at the conference indicating bias against FMC. At
several points in their remarks, both judges emphasized the
importance of impartiality. Transcript of *Tribal Courts:
Jurisdiction and Best Practices* ("Transcript") at 9 and 19
(stating "every court has—should be impartial"; "a good
opinion comes [from] both sides, both parties. Because both
parties rely on a good opinion, strong opinion."; you "need to
make sure that you do the job right"). Although Judges
Gabourie and Pearson criticized various Supreme Court
opinions, including *Montana*, disagreement with an opinion
of the Supreme Court does not indicate that judges cannot
faithfully apply that opinion to the case before them. If such
were the case, federal and state judges would need to recuse
themselves with some frequency. *See, e.g.*, *Republican Party
of Minn. v. White*, 536 U.S. 765, 779 (2002) ("[J]udges often
state their views on disputed legal issues outside the context
of adjudication—in classes that they conduct, and in books
and speeches."); *In re Complaint of Judicial Misconduct*,
632 F.3d 1289, 1289 (9th Cir. 2011) ("The Code of Conduct
encourages judges to 'speak, write, lecture, teach, and
participate in other activities concerning the law, the legal
system, and the administration of justice.' Engaging in such
law-related activities—including speeches that comment on
current events and legal developments—is permitted not only
because judges are citizens, but because they are particularly
knowledgeable on such topics." (internal citations omitted));
*In re Charges of Judicial Misconduct*, 769 F.3d 762, 785
(D.C. Cir. 2014) ("[C]riticizing the [Supreme] Court does not

constitute judicial misconduct. . . . It would be all but impossible for a judge to urge changes in the course of the law, or even to comment on substantive legal issues, without being able to reference and criticize decisions of the Supreme Court.  Not surprisingly, then, there is a long tradition of lower court judges criticizing the Court on issues of constitutional law [and other areas].").

Judge Pearson did mention at one point that she had a "big case" that she believed was "going to go up," and that she was saying prayers, reading cases, and trying to do the history.  However, she said nothing about the merits of the case.  *Cf. In re Charges of Judicial Misconduct*, 769 F.3d at 787–88 ("[N]otwithstanding the general prohibition on commenting on the merits of pending or impending matters, the Code contains an exception for offering such comments in the context of 'scholarly presentations made for purposes of legal education.'" (citing Canon 3A(6) of the Judicial-Conduct Rules)).

Second, to the degree Judges Gabourie and Pearson's remarks may be thought to have indicated bias against FMC, a reconstituted panel of judges considered the prior rulings of the Tribal Court of Appeals.  The reconstituted panel revised one aspect of the court's prior decision and affirmed the others.  A differently reconstituted panel then handled all proceedings going forward, including the hearing on jurisdiction under *Montana*'s second exception.  The actions of the reconstituted panels eliminated any possible due process concerns arising from the remarks of Judges Gabourie and Pearson, and from their participation in earlier decisions of the Tribal Court of Appeals.

FMC makes other due process arguments, including that the Fort Hall Business Council improperly closed the record; that the Tribal Court of Appeals improperly rejected evidence from FMC as untimely; that the Tribal Court of Appeals, rather than the trial court, held an evidentiary hearing; and that the tribal courts are not independent from the Fort Hall Business Council. FMC has either waived these arguments or they are self-evidently meritless.

FMC's due process arguments are based in part on an underlying argument that, in FMC's words, tribal courts present "inherent risks . . . for denying nonmembers" due process protections. The Supreme Court, our circuit, and our sister circuits have repeatedly rejected that and other similar arguments. *See, e.g.*, *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855–57 (1985) (requiring nonmembers to exhaust tribal court remedies and stating that exhaustion will "provide other courts with the benefit of [tribal court] expertise"); *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236, 1249–50 (10th Cir. 2017) ("We also reject the officers' arguments that they will suffer undue bias and a lack of due process if subjected to tribal jurisdiction. The officers offer little support for their allegations, which boil down to baseless 'attacks' on the competence and fairness of the Ute Tribal Court. The Supreme Court has already explained that such arguments are contrary to federal policy . . . . The Court has also 'repeatedly' recognized tribal courts 'as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians.'" (citing *Iowa Mut. Ins. Co.*, 480 U.S. at 19; *Santa Clara Pueblo*, 436 U.S. at 65; *Wheeler*, 435 U.S. at 332 ("[T]ribal courts are important mechanisms for protecting significant tribal interests."))).

The Tenth Circuit recently wrote, "Although it is true that the Bill of Rights does not itself constrain tribal court proceedings, *see Talton v. Mayes*, 163 U.S. 376, 382–85 (1896), this does not leave the rights of nonmembers unprotected in tribal courts." *Norton*, 862 F.3d at 1249. "The Indian Civil Rights Act (ICRA), 25 U.S.C. §§ 1301–04, expressly provides that no tribe may 'deny to *any person* within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law.'" *Id.* at 1249–50 (citing 25 U.S.C. § 1302(a)(8)); *see also Iowa Mut. Ins. Co.*, 480 U.S. at 19 (noting that ICRA "provides non-Indians with various protections against unfair treatment in the tribal courts"). "Making good on these due process guarantees, nearly five decades of tribal cases applying ICRA show that tribal courts protect the rights of both member and nonmember litigants in much the same way as do federal and state courts." *Norton*, 862 F.3d at 1250. "[T]ribal courts often provide litigants with due process that 'exceed[s] the protections offered by state and federal courts.'" *Id.* (second alteration in original) (citing Matthew L.M. Fletcher, *American Indian Tribal Law* 325 (2011)).

"[E]mpirical studies demonstrate that tribal courts are even-handed in dispensing justice to nonmembers." *Id.*; *see, e.g.*, Bethany R. Berger, *Justice and the Outsider: Jurisdiction Over Nonmembers in Tribal Justice Systems*, 37 Ariz. St. L.J. 1047, 1047, 1051 (2005) ("Navajo appellate courts are remarkably balanced in hearing cases involving outsiders. . . . The court is both numerically balanced in its decisions regarding nonmembers . . . and qualitatively balanced, even in areas . . . that might seem particularly prone to bias. A less comprehensive review of decisions from other tribal court systems reveals a similar effort to decide issues fairly, even where it requires ruling against tribal members or

Case: 4:14-cv-00489-BLW Document 113 Filed 11/15/19 Page 56 of 56

56      FMC Corp. v. Shoshone-Bannock Tribes

the tribe itself."); Mark D. Rosen, *Multiple Authoritative Interpreters of Quasi-Constitutional Federal Law: Of Tribal Courts and the Indian Civil Rights Act*, 69 Fordham L. Rev. 479, 578 (2000) (concluding from a study of twelve years of decisions from approximately twenty-five tribal courts that "tribal courts have [not] succumbed to the temptation to favor the insider at the expense of outsiders").

Our own experience in reviewing tribal court decisions is consistent with the findings of these studies. Tribal courts, like all courts (including our own), make mistakes. But, contrary to the contention of FMC, tribal courts do not treat nonmembers unfairly.

### C.  Comity

Because we hold that the Tribes had regulatory and adjudicatory jurisdiction under both *Montana* bases, and that FMC was not denied due process, we recognize and enforce the Tribal Court of Appeals' judgments under principles of comity. *See AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d at 903. The judgment of the Tribal Court of Appeals is enforceable under both the first and second *Montana* exceptions. *See Wilson v. Marchington*, 127 F.3d at 810.

### Conclusion

We hold that the Tribes had regulatory and adjudicatory jurisdiction under both *Montana* exceptions, and that the Tribal Court of Appeals did not violate FMC's right to due process. We hold that the judgment of the Tribal Court of Appeals is enforceable under principles of comity.

**AFFIRMED.**